# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-3210

_____

In re: K-tel International, Inc.      *
Securities Litigation               *
                                        *
_____                    *

Pasquale Migliaccio; Creative Care  *
Corporation; Glen Reudolph; Morton  *
Kahn; David Rea; Henry Werres;    *
Claude Seymour; Igal Mammon; Neil  *
Litton, Dr.; Jerry Booth; Joseph    *
Erlich; Gary Ewin; Tim Murchison;  *
Stanford D. Williams; Rev. R. G.   *
Moore; Murray N. Johnson; Elizabeth *
Alpert; Arthur Alves; Societe      *
Financiere Privee and Ravi Anand, on *
behalf of themselves and all others  *
similarly situated,            *
                                        *

        Appellants,       *  Appeal from the United States
                            *  District Court for the District
    v.                   *  of Minnesota.
                            *

K-Tel International, Inc.; Philip Kives; *
Lawrence Kives,            *
                                        *

        Appellees,        *

_____                    *
                                        *

Securities and Exchange Commission, *
                                        *

    Amicus on Behalf of Appellants. *

_____

Submitted: October 17, 2001

Filed: August 7, 2002
_____

Before WOLLMAN,[1] Chief Judge, MURPHY, and RILEY, Circuit Judges.
_____

RILEY, Circuit Judge.

The appellants appeal the district court's[2] dismissal of their complaint and denial of their motion to amend. The appellants allege the appellees committed securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and related Securities and Exchange Commission (SEC) Rule 10b-5 by failing to make certain accounting adjustments in compliance with Generally Accepted Accounting Principles (GAAP) and by failing to make a timely disclosure regarding a NASDAQ delisting letter. The district court dismissed the complaint for failure to allege the accounting violations with the requisite particularity under Fed. R. Civ. P. 9(b) and for failure to plead facts "giving rise to a strong inference that the defendant[s] acted with the required state of mind" as dictated by the Private Securities Litigation Reform Act (the Reform Act), 15 U.S.C. § 78u-4(b)(2). In re K-tel Int'l, Inc. Sec. Litig., 107 F. Supp. 2d 994 (D. Minn. 2000). We affirm the district court's well reasoned opinion.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002. He has been succeeded by the Honorable David R. Hansen.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

## I. BACKGROUND

K-tel International, Inc. (K-tel) through certain of its current and former officers and directors, Philip Kives, Lawrence Kieves,[3] David Weiner, Corey Fischer, and Jeffrey Koblick (defendants and appellees), markets and distributes entertainment and consumer products, including pre-recorded music compilations. During the relevant time period, K-tel common stock was publicly traded on the NASDAQ National Market System (NMS). The appellants constitute a class of those who acquired K-tel common stock between May 8, 1998, and 11:36 a.m. on November 17, 1998 (the Class). The Class alleged that during the class period they suffered damages as a result of violations by K-tel of the anti-fraud provisions of federal securities laws. 15 U.S.C. § 78(b); 17 C.F.R. § 240.10b-5 (1995).

On May 5, 1998, K-tel announced the financial results for the quarter ending March 31, 1998, which reported a decline in sales and income. On May 8, 1998, K-tel filed with the SEC its Form 10-Q for the quarter ending March 31, 1998 (the March 10-Q), echoing the negative information previously disclosed. The March 10-Q represented net tangible assets in excess of $4 million. During the period from May 5, 1998, to June 9, 1998, K-tel's share price dropped from $33.94 to $11.25.

On October 13, 1998, after an extension of time requested by K-tel, the company filed Form 10-K, an annual report filed with the SEC, for K-tel's fiscal year ending June 30, 1998. In the June 10-K, K-tel disclosed a shareholders' equity of $3,774,000, thereby representing K-tel was $226,000 below the $4 million net tangible asset minimum requirement for continued listing on NASDAQ.

---

[3]The case captions in both the district court and this Court spell this individual's name as Lawrence "Kives." The remaining documents filed with both courts reflect the name is spelled Kieves. Therefore, this court will reference him as Kieves.

On October 19, 1998, the National Association of Securities Dealers (the NASD) notified K-tel that K-tel's net tangible assets, based upon the June 10-K, had fallen below the $4 million minimum level necessary for continued listing. K-tel made no public announcement at this time of either its receipt of the October 19, 1998 delisting letter or its request for a hearing and temporary extension of time to meet the net tangible asset requirement. However, on November 3 and November 10, K-tel made public announcements regarding a partnership with Playboy Online for an on-line music store and another partnership arrangement with Microsoft.

On November 16, 1998, K-tel filed its Form 10-Q for the quarter ending September 30, 1998 (September 10-Q). The September 10-Q included information regarding negative financial results and also the receipt of the October 19, 1998 NASD letter. K-tel was not actually delisted as a result of the October 19, 1998 NASD letter.

A series of common stock transactions by individual defendants occurred during the class period. Specifically, almost 2.7 million shares of K-tel common stock were sold by four individual defendants between May 8, 1998, and June 9, 1998.[4] From June 9, 1998 to November 17, 1998, there were only two other transactions by the individual defendants: on November 13, 1998, Koblick *purchased* 27,200 shares through the exercise of stock options, and on November 17, 1998, the day after filing the September 10-Q, Fischer sold 15,000 shares. The Class alleged

---

[4]The complaint alleged: Kives, who owned 42% of K-tel's common stock, sold 2,202,303 shares between May 11, 1998, and June 9, 1998, for over $26 million; Kieves sold no shares of common stock during the class period; Weiner, who resigned in August 1998, sold 390,000 shares between May 8, 1998, and May 26, 1998, for approximately $11.7 million; (Fischer sold 30,000 shares on May 8, 1998, (6,000 shares) and on November 17 and 18, 1998, (24,000 shares which are at the end of or outside the class period) for approximately $532,000); and Koblick sold 82,178 shares on May 8, 1998, for approximately $2.6 million.

the individual defendants received over $41 million from the sales of K-tel common stock during the class period.

In its three-count amended complaint, the Class alleged violations of section 10(b) of the Exchange Act and Rule 10b-5 based upon the omission of material adverse information and the knowing or reckless dissemination of false statements (Count I); violations by the individual defendants of section 20(a) of the Exchange Act based upon their alleged wrongful conduct (Count II); and violations by the individual defendants of section 20A of the Exchange Act based upon their sales of common stock (Count III). In Counts II and III, the Class raised claims against individual defendants Kives, Kieves, and Koblick. On appeal the Class does not challenge the district court's dismissal of these two counts.

The Class alleged that a continuous fraudulent scheme in combination with large stock trades by some of the individual defendants gave rise to the securities law violations in Count I. As alleged, the scheme was characterized by two circumstances. First, the Class alleged two accounting violations gleaned from K-tel's SEC filings. The Class asserts K-tel knew in March 1998 of a $1.498 million loss due to the poor performance of a subsidiary and K-tel was required by GAAP to write-off the assets of the subsidiary in its March 10-Q filing, filed May 8, 1998. K-tel wrote down assets in that amount by March 1999. Additionally, the Class alleged K-tel failed to disclose future losses of $1.8 million related to the subsidiary, also in violation of GAAP. The Class alleged such overstating of assets in the March 10-Q and the later June 10-K is a violation of GAAP and is evidence of fraud and scienter because K-tel's inclusion of the overstated assets concealed its inability to comply with the minimum necessary tangible net asset requirement for continued listing on the NMS.

Second, the Class alleged K-tel's failure to disclose publicly the October 19, 1998 NASD letter is evidence of fraudulent intent. The Class alleged K-tel's failure

to disclose the letter in the four-week period after it was received was a material omission because during the period K-tel was involved in press releases extolling the company's business including, *inter alia*, new partnerships with Playboy Online and Microsoft.

The district court granted K-tel's motion to dismiss all claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and 15 U.S.C. § 78u-4(b)(2), finding the amended complaint failed to allege with sufficient particularity either material misrepresentations or facts giving rise to a strong inference of scienter. Further, the district court denied leave to amend the complaint again and entered judgment for K-tel and the individual defendants.

## II.    DISCUSSION

The Exchange Act § 10(b) and related rules prohibit "the use of any 'manipulative or deceptive device or contrivance' in connection with the purchase or sale of a security." Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1533 (8th Cir. 1996) (quoting 15 U.S.C. § 78j(b) and Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)); see also In re Navarre Corp. Sec. Litig., No. 01-2543, slip op. at 8 (8th Cir. July 31, 2002).  Rule 10b-5 provides that it is unlawful:

> for any person, directly or indirectly . . .
> (a)    To employ any device, scheme, or artifice to defraud,
> (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1995).

In order to proceed on claims brought pursuant to section 10(b) and Rule 10b-5, the Class is required to show four elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. See 17 C.F.R. § 240.10b-5; In re Navarre Corp., No. 01-2543, slip op. at 9. Alpern, 84 F.3d at 1533-34.

We review the dismissal of a complaint for failure to state a claim upon which relief may be granted de novo, affirming the district court if the plaintiffs cannot prove any set of facts which would entitle them to the relief requested. See In re Navarre Corp., No. 01-2543, slip op. at 8. In so doing, we construe the complaint liberally, taking all factual allegations as true, but rejecting conclusory or catch-all assertions of law and unwarranted inferences. Id.

The Reform Act[5] embodies the pleading requirement of Fed. R. Civ. P. 9(b). Id. at 10. Under the Reform Act the complaint must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the Reform Act requires "with respect to each act or omission alleged" that a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). These pleading standards, unique to securities cases, were an attempt to restrain securities fraud litigation abuses such as the practice of pleading by hindsight. In re Navarre Corp., No. 01-2543, slip op. at 9, 11 (citations omitted).

---

[5]The Reform Act is the 1995 amendment to the Exchange Act.

The Reform Act requirements modify review of a motion to dismiss in two significant ways. First, "we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001). Second, the complaint must plead specific facts giving rise to a "strong inference" of the required state of mind.[6] Id.; see also In re Navarre Corp., No. 01-2543, slip op. at 9-10.

Furthermore, because the decision to dismiss a complaint for failure to state a claim involves no factual findings, we owe no deference to the district court. Abels v. Farmers Commodities Corp., 259 F.3d 910, 916 (8th Cir. 2001). "[W]e may affirm the district court's judgment on any basis supported by the record." Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999) (citation omitted). The court may consider, in addition to the pleadings, materials "embraced by the pleadings" and materials that are part of the public record. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999); see also Green Tree, 270 F.3d at 663.

We will first address the issues surrounding pleading with particularity the allegations related to accounting violations.

## A.    Pleading with Particularity - GAAP

Generally Accepted Accounting Principles, or GAAP, are "a series of general principles followed by accountants." United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir. 2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a

---

[6]The Sixth Circuit has gone so far as to hold that "plaintiffs are entitled only to the most plausible of competing inferences." See Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001). Although our opinion in Green Tree cited the Sixth Circuit's decision in Helwig, Green Tree, 270 F.3d at 661, we do not believe that Green Tree adopted Helwig's statement about "the most plausible of competing inferences" as the law of this Circuit.

private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n.4 (2d Cir. 2000).

"There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995). The sources for GAAP include official publications consisting of APB opinions, FASB Statements and Accounting Research Bulletins (ARB). "Included in GAAP are the Financial Accounting Standards ('FAS') published by the [FASB]." Basin Elec., 248 F.3d at 786.

GAAP "are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor Power Tool Co. v. C. I. R., 439 U.S. 522, 544 (1979) (footnote omitted); see also Guernsey Mem'l, 514 U.S. at 101 (finding GAAP "[f]ar from a single-source accounting rulebook" and "not [a] lucid or encyclopedic set of pre-existing rules," and "GAAP changes and, even at any one point, is often indeterminate"). "When such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." Id. In fact, "[i]n the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP." Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 218 n.7 (9th Cir. 1995).

As our Court recently said: "Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." In re Navarre Corp., No. 01-2543, slip op. at 15 (internal citation omitted); see also DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002);

City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1261 (10th Cir. 2001) ("Only where such allegations [GAAP violations or accounting irregularities] are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim."); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1208 (11th Cir. 2001) (citing cases) (Allegations of "violations of . . . GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."). Under the Reform Act, the circumstances of the fraud must be stated with particularity, including "such matters as the time, place and contents of false representations, as well as, the identity of the person . . . and what was obtained or given up thereby. . . . This means the who, what, when, where, and how." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir. 1997). Conclusory allegations do not satisfy the pleading requirements of the Reform Act. Id. at 549; In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000).

In this case, the Class alleged violations of Financial Accounting Standard 121 (FAS 121) and Financial Accounting Standard 5 (FAS 5). Generally, the Class alleged K-tel violated FAS 121 and FAS 5 when it filed the March 10-Q, on May 8, 1998, by representing its net tangible assets were in excess of $4 million. The March 10-Q, signed by individuals Kives, Weiner, and Fischer, stated in relevant part:

> In 1997, the Company formed an [sic] U.S. media-buying and infomercial-marketing subsidiary, which performed media buying services for third parties and also marketed products through infomercials produced by third parties. As of March 31, 1988 [sic], due to accumulated losses to date of $1,300,000 the Company has curtailed most of these media buying operations and will now focus on its existing primary businesses - music distribution and direct response marketing, and its newly launched Internet retailing business.

Similarly, the Class alleged K-tel continued the fraudulent scheme through the June 10-K filed on October 13, 1998. The June 10-K made an almost identical statement as did the March 10-Q but included the accumulated losses through June

-10-

30, 1998 in the amount of $2.3 million. The June 10-K represented net tangible assets below $4 million and was signed by all of the individual defendants.

K-tel counters by arguing the Class is only alleging fraud by hindsight in relying on later write-off amounts in order to argue the write-offs should have been made earlier. Specifically, K-tel points to the complaint which alleged "$800,000 was charged to earnings during the quarter ended September 30, 1998, and $698,000 was charged to earnings during the six-month period ended March 31, 1999." These two amounts equal $1,498,000, the amount the Class alleged was the subsidiary's loss known to K-tel in March 1998.

Additionally, the complaint alleged $1.8 million in future losses would be incurred due to this subsidiary's contracts; however, the Class fails to specify how it arrived at this figure. The figure does not include $1 million of additional accumulated losses (difference between the March 10-Q and the June 10-K) which the Class breaks into $.3 and $.7 million increments, alleging at least the $.3 million amount should have been disclosed in the March 10-Q as it was incurred by May 8, 1998.

"[W]e cannot countenance pleading fraud by hindsight . . . ." Green Tree, 270 F.3d at 662. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); see also In re Navarre Corp., No. 01-2543, slip op. at 12; Acito, 47 F.3d at 53. Under the Reform Act the complaint must allege "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." In re Navarre Corp., No. 01-2543, slip op. at 11.

-11-

What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. . . . [A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*.

City of Philadelphia, 264 F.3d at 1260 (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994) (en banc)).

### 1.    FAS 121.

FAS 121 relates to the accounting for the impairment and disposal of long-lived assets and certain identifiable intangibles.  Specifically, FAS 121:

[R]equires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In performing the review for recoverability, the entity should estimate the future cash flows expected to result from the use of the asset and its eventual disposition. If the sum of the expected future cash flows . . . is less than the carrying amount of the asset, an impairment loss is recognized. Otherwise, an impairment loss is not recognized.

FAS 121, summary *available at* http://accounting.rutgers.edu/raw/fasb/map/index. html.

The Class alleged the asset subject to FAS 121 review is the Infomercial Subsidiary.  No review for the impairment of this asset was reflected in the March 10-Q.  The Class alleged K-tel was required by FAS 121 to perform the review because a change in circumstances – namely the curtailing of operations and stated losses – indicated the recoverability of the carrying amount of the subsidiary assets

-12-

should have been assessed for impairment. The Class further alleged an assessment would have revealed K-tel's obligation pursuant to FAS 121 to write-off the $1,498,000 cost of non-useable infomercials and other media items purchased by the subsidiary. K-tel later charged $800,000 to earnings for the quarter ending September 30, 1998, and $698,000 during the six-month period ending March 31, 1999.

K-tel argues the complaint contains no particularized allegation supporting the $1,498,000 figure or the asset or assets subject to FAS 121 assessment. Further, K-tel contends the Class has failed to allege facts implicating a violation of FAS 121. K-tel concludes the Class failed to allege facts showing FAS 121 had been triggered and violated.

Although a change in circumstances occurred by the curtailing of operations, which may implicate FAS 121, the complaint failed to allege particular assets subject to FAS 121 assessment. If, however, the assets intended by the Class include the subsidiary itself or unspecified "infomercials and other media items," we are unconvinced FAS 121 is implicated.

The district court found, and we agree, "'long-lived assets' include items such as land, buildings, equipment and furniture." In re K-tel, 107 F. Supp. 2d. at 1000 (listing accounting sources). "'Identifiable intangibles' include items such as patents, franchises, and trademarks." Id. The assets alleged by the Class are not long-lived assets or identifiable intangibles. Therefore, as a matter of law, the Class has failed to allege facts triggering FAS 121.

Rather than argue the district court erred as a matter of law, and submit contrary accounting sources, the Class states, untenably, the district court made its determination as a factual finding. While the allegations contained in the complaint may withstand standard notice pleading, such allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating

-13-

FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets. See Greebel v. FTP Software, Inc., 194 F.3d 185, 204 (1st Cir. 1999) (plaintiffs presented invoices, purchase orders, and other documentation to substantiate their contentions).

Furthermore, the Class has failed to allege any basis or source for why $1,498,000 should have been written off in March 1998 pursuant to FAS 121, rather than in September 1998 and March 1999 pursuant to other accounting rules. Accordingly, the Class allegations related to FAS 121 fail for lack of particularity.

### 2.    FAS 5.

FAS 5 establishes standards of financial accounting and reporting for loss contingencies. FAS 5:

> [R]equires accrual by a charge to income (and disclosure) for an estimated loss from a loss contingency if two conditions are met:
> (a)    information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and
> (b)    the amount of loss can be reasonably estimated.

FAS 5, summary *available at* http://accounting.rutgers.edu/raw/fasb/map/index.html.

The Class alleged FAS 5 required K-tel to make a $1.8 million charge to income and disclose the subsidiary's future obligations and likely losses. The Class alleged that the subsidiary:

> a.    Was obligated to perform under one or more contracts which were likely to result in additional future losses of approximately $1.8 million (over and above those which had already been reported) during the twelve month period ended March 31, 1999; and

-14-

b. Had already sustained no less [than] $.3 million in additional losses (over and above the accumulated losses of $1,300,000 which had been reported) as of the May 8, 1998 date of filing of the March 31, 1998 Form 10-Q, and would suffer an additional $.7 million in losses by June 30, 1998.

Again, the Class fails to provide any basis for the allegations or sources for the amounts, other than later financial disclosure made by K-tel. The Class fails to specify any contracts or circumstances that K-tel knew at the time of the March 10-Q or June 10-K would result in the specified losses. Merely stating a particular dollar amount without a corresponding source or basis is insufficient under the Reform Act. See Parnes, 122 F.3d at 550. The complaint does not explain what specific information was available and how any loss could be reasonably estimated for the March 10-Q or the June 10-K. Accordingly, the Class allegations related to FAS 5 also fail for lack of particularity.

## B. Scienter

Scienter is not explicitly required by the statutory text of the Exchange Act, but it is an acknowledged essential element of a section 10(b) and Rule 10b-5 claim. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Green Tree, 270 F.3d at 653; Alpern, 84 F.3d at 1534. "[W]e view the investors' amended complaint to determine whether they set forth facts that give a *strong* reason to believe that there was reckless or intentional wrongdoing." In re Navarre Corp., No. 01-2543, slip op. at 16.

Traditionally, there are three methods of establishing scienter. First, scienter may be established from facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud." Hochfelder, 425 U.S. at 193 n.12; Alpern, 84 F.3d at 1534; Helwig, 251 F.3d at 548. Second, while allegations of negligent conduct are not sufficient, Hochfelder, 425 U.S. at 215, conduct which rises to the level of severe recklessness may be sufficient to meet the scienter requirement. K & S P'ship v. Continental Bank, N.A., 952 F.2d 971, 978 (8th Cir. 1991). Such sufficient conduct

is limited to "highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. (citing Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985)).

Recently, we determined the effect of the third method of establishing a strong inference of scienter, allegations of motive and opportunity. "[M]otive and opportunity are generally relevant," but particularly important to establishing scienter is a showing of unusual or heightened motive to meet the Reform Act standard. Green Tree, 270 F.3d at 660. Additionally, the facts giving rise to motive and opportunity may also support a "reason to believe the defendant's misrepresentation was knowing or reckless." Id. Finally, without a showing of motive or opportunity "other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard." Id.; see also In re Navarre Corp., No. 01-2543, slip op. at 16-17.

Generally, the issue of whether a particular intent existed is a question of fact for the jury. Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999). Since "'conclusory allegations' do not satisfy the pleading requirements of Rule 9(b)," the complaint must provide a factual basis for allegations of scienter. In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d at 40; see Parnes, 122 F.3d at 549-50. Additionally, unsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law. See Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001); Green Tree, 270 F.3d at 664 (finding a desire "universally held among corporations and their executives . . . does not contribute significantly to an inference of scienter"). The "plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 139.

The Second Circuit has found insufficient motives to include "1) the desire for the corporation to appear profitable and 2) the desire to keep stock prices high to increase officer compensation." Id. However, alleging the defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock is sufficient. Novak, 216 F.3d at 308. In contrast, evidence that the individual defendants abstained from trading may undercut allegations of motive. Acito, 47 F.3d at 54; see Green Tree, 270 F.3d at 663 (noting same, but finding no allegations of insider trading).

We agree with the Second Circuit. More specifically, we have found where an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the timing of an overstatement of earnings, motive is sufficiently pled. Green Tree, 270 F.3d at 661. However, the general desire to maintain a high credit rating or make a company appear attractive to potential buyers may be "too thin a reed on which to hang an inference of scienter." Id. at 664.

### 1. Accounting violations.

As discussed above, allegations of GAAP violations, alone, are insufficient to state a claim for securities fraud. In re Navarre Corp., No. 01-2543, slip op. at 15. The Class alleged K-tel knew or was reckless in not knowing prior to filing the March 10-Q that a subsidiary or its assets had been impaired and that K-tel was required by FAS 121 to write-off the assets in the amount of $1,498,000. The Class claimed such knowledge was evident in K-tel's stated intention to curtail subsidiary activities. It contended the write-off was not timely completed with the purpose of inflating stock prices until after the delisting issue was resolved and the individual defendants had completed millions of dollars in insider trading. Further, the Class alleged the failure to write-off the impaired assets resulted in an overstating of assets, net worth and earnings. Finally, the Class claimed the March 10-Q was materially false and misleading when it stated the subsidiary operations had been curtailed because the

-17-

subsidiary had contract obligations which would result in additional losses of $1.8 million about which FAS 5 required disclosure in May 1998.

The Class alleged K-tel's knowing overstatement of assets in violation of GAAP evinces fraudulent intent. It claimed K-tel's asset base was deteriorating due to the losses sustained, and expected to sustain, by the subsidiary. The Class contended K-tel deferred GAAP imposed write-offs in order to artificially maintain an asset base of over $4 million, NASDAQ's minimum net asset value requirement for listing. The deferral allegedly facilitated the sale of stocks by four of the individual defendants prior to public disclosure of the possibility of delisting. The Class further alleged the individual defendants, as executives of the company, by at least May 8, 1998, knew of the facts surrounding the improper accounting conduct. Specifically, the Class concluded K-tel stated its intentions to curtail the activities of the subsidiary, thereby acknowledging the impaired nature of the assets. Finally, the Class alleged the sheer magnitude of the GAAP violations exhibit scienter.

The Class alleged multiple motives for the individual defendants including (a) inflating the price of K-tel's common stock, (b) avoiding or delaying NASDAQ delisting, (c) deferring adverse effects of NASDAQ delisting, (d) increasing compensation directly tied to stock price, and (e) protecting employment with K-tel. The motive allegations are insufficient to support scienter. We will address them in reverse order.

As stated above, general allegations of a desire to increase stock prices, increase officer compensation or maintain continued employment are too generalized and are insufficient. See Kalnit, 264 F.3d at 139. While such allegations may be sufficient if the benefit to an individual defendant is unusual, Green Tree, 270 F.3d at 661, no such allegations were pled in this case. The Class failed to allege how or to what extent the defendants' compensation or continued employment was tied to stock price or to what degree, if any, the defendants benefitted.

The motive allegations related to delisting are insufficiently pled to support a finding of a strong inference of fraudulent intent. Even assuming GAAP violations occurred, the Class has alleged no facts to support the inference that the individual defendants violated GAAP in the March or the June, 1998 reports to avoid delisting. The Class allegation assumes the defendants knew they would be receiving a delisting letter and would, in fact, be delisted. The record shows K-tel was not delisted, even though the June 10-K represented the company was below NASDAQ requirements for continued listing and the NASD delisting letter was sent October 19, 1998. Further, an intent to "curtail" certain activities based on past losses does not, by itself, raise a red flag that nearly $1.5 million in assets need be immediately written off. The Class has failed to allege facts demonstrating K-tel had the intent to defraud.

The Class contends massive insider trading is evidence of the defendants' motive to commit fraud through inflating stock price. "[U]nusual insider trading activity during the class period may permit an inference of bad faith and scienter." Acito, 47 F.3d at 54. Here, however, the Class alleged only conclusory statements that the insider sales were unusual or suspicious. Such conclusory and speculative allegations are insufficient. See In re Comshare, Inc., Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999). The Class failed to allege the prior history of sales for the defendants or even the number of shares held by each. See Greebel, 194 F.3d at 207 (holding plaintiffs' failure to provide information regarding sales made by insiders at times outside the class period permitted no possibility of comparison). Therefore, the Class failed to allege facts to show the trading activity was unusual or how it was unusual.

Additionally, taking each defendant individually decreases any inference of scienter. Kieves, company president in October 1998 and previously on the board of directors, sold no shares of common stock during the class period. Kieves's conduct actually undercuts the Class's argument. See Acito, 47 F.3d at 54.

Weiner sold 390,000 shares between May 8, 1998, and May 26, 1998, for approximately $11.7 million. Weiner's conduct should not materially impact the scienter analysis because he resigned as company president in August 1998. See Greebel, 194 F.3d at 206 ("It is not unusual for individuals leaving a company, like [defendant], to sell shares.").

The complaint alleged the remaining defendants sold shares between May 8, 1998, and June 9, 1998, during a period when the stock price experienced a steady decline from approximately $34 to $11.25. Specifically, Kives, who owned 42% of K-tel's common stock, sold 2,202,303 shares between May 11, 1998, and June 9, 1998, for over $26 million; Fischer sold 6,000 shares on May 8, 1998, for approximately $195,000; and Koblick sold 82,178 shares on May 8, 1998, for approximately $2.6 million. As alleged in the complaint, on May 5, 1998, K-tel announced the financial results for the quarter ending March 31, 1998, which included a decline in sales and income. On May 8, 1998, K-tel filed its March 10-Q, echoing the negative information previously disclosed. "Selling after delivering news that causes a company's stock price to go down is not suggestive of withholding information." Greebel, 194 F.3d at 207 (finding no sales were made before a big "event" was made known to the public, and sales were made after negative information was disclosed and before positive information was disclosed); see Nathenson v. Zonagen Inc., 267 F.3d 400, 418 (5th Cir. 2001) (decrease in stock price after allegedly misleading disclosure precluded action under fraud-on-the-market theory). Therefore, similar to the Greebel court, we find, "[a]lthough the total sum involved was large, the . . . plaintiffs produced no evidence that the trading was out of the ordinary or suspicious." Greebel, 194 F.3d at 207.

If we were to conclude the trading provides circumstantial evidence of scienter, the claim would still fail because the trading did not coincide with false or misleading statements, which is required to survive dismissal. See In re Navarre Corp., No. 01-2543, slip op. at 20. Accordingly, it is not possible to draw a "strong inference" of

scienter based on (a) the alleged accounting violations or (b) the alleged improper trading.

### 2. October 1998 delisting letter.

The Class alleged K-tel's failure to disclose the October 19, 1998 delisting letter when received, or at least contemporaneous with other public announcements, is evidence of a strong inference of fraudulent intent because the failure created a material omission.

We agree with the district court that the Class failed to show a strong inference of scienter. We will assess this claim only with regard to the delisting letter allegations, namely, whether they meet the materiality requirement for securities fraud. See 17 C.F.R. § 240.10b-5; Alpern, 84 F.3d at 1533-34.[7] Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury. Silver v. H&R Block Inc., 105 F.3d 394, 396 (8th Cir. 1997). "The issue is appropriately decided as a matter of law, however, when reasonable minds could

---

[7]The Reform Act outlines the pleading requirements for a claim based upon misleading statements and omissions as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

See 15 U.S.C. § 78u-4(b)(1).

not differ. In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." Id. (citation omitted); see Press, 166 F.3d at 538. "Accordingly, a complaint that alleges only immaterial misrepresentations presents an 'insuperable bar to relief' . . . and dismissal of such a complaint is proper." Parnes, 122 F.3d at 546 (quoting Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982)).

A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (citation omitted) (adopting the standard of materiality from TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), for section 10(b) and Rule 10b-5 claims); see Parnes, 122 F.3d at 546. Material information is that which "would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Indus., 426 U.S. at 449; see Press, 166 F.3d at 538. This determination requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." TSC Indus., 426 U.S. at 450. In contrast, a fact is immaterial "[w]here a reasonable investor could not have been swayed" by the misrepresentation. Parnes, 122 F.3d at 546. Immaterial statements include vague, soft, puffing statements or obvious hyperbole. Id. at 547 (finding a prediction of "significant growth" is immaterial).

K-tel argues its failure to disclose the delisting letter prior to November 16, 1998, cannot be considered as part of a showing of scienter because it did not have a duty to disclose the delisting letter. The parties agree that a duty to disclose the letter arises only when 1) a regulation, statute or rule requires disclosure; 2) disclosure is required to prevent a voluntary statement from being misleading; or 3) the defendants are engaging in insider trading. See Backman v. Polaroid Corp., 910

F.2d 10, 12-13 (1st Cir. 1990) (en banc).  In this case the parties agree K-tel had no duty to disclose pursuant to regulation, statute or rule.[8]

"Materiality alone is not sufficient to place a company under a duty of disclosure."  In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997).  In fact, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic Inc., 485 U.S. at 239 n.17.  "A duty arises, however, if there have been inaccurate, incomplete or misleading disclosures."  Sailors v. Northern States Power Co., 4 F.3d 610, 612 (8th Cir. 1993).  Therefore, "even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects."  Helwig, 251 F.3d at 561 (internal quotations and citation omitted).  However, the requirement is not to dump all known information with every public announcement, but the law requires "an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."  Id. (internal quotations and citation omitted) (emphasis added).  In this case, the Class argues four public statements made by K-tel rendered misleading the omission of a public disclosure regarding the delisting letter.

The first public statement made by K-tel was on November 3, 1998.  K-tel's vice president of corporate development stated, with regard to the new partnership agreement with Playboy Online: "We expect the Playboy/K-tel Music Store to compete with leading online music services such as CDNow, Inc., N2K, Inc., and Amazon.com, Inc."

---

[8]Notably, after the occurrence of the facts giving rise to this lawsuit, the NASD passed rules which require disclosure of the receipt of a delisting letter within seven calendar days or face a trading halt.  Association of Securities Dealers, Inc., NASD Manual Marketplace Rule 4815(b) and Nasdaq Stock Market Section IM-4120-2 (Nov. 2000) *available at* http://secure.nasdr.com.

The defendant Lawrence Kieves made two statements on November 10, 1998. Kieves announced, with regard to the partnership with Microsoft: "Microsoft's extensive online outreach to the consumer is in a league of its own and will further enhance the K-Tel Express brand name across the Internet." Additionally, Kieves appeared on CNBC stating: "We're looking at several options now, we're looking at several strategic opportunities for our Company that would be very premature to announce right now, including most traditional financing options: a secondary offering, perhaps partnering up with somebody in a strategic venture with regard to our sales."

Finally, on November 12, 1998, after the close of the market, but prior to filing the September 10-Q, K-tel reported its financial results for the quarter ending September 30, 1998, by press release. The Class alleged only that the November 12 press release did not include information about the October 19, 1998 delisting letter, nor did it include enough information to determine whether K-tel was in compliance with the listing requirements. The Class does allege, however, K-tel common stock closed down $8 per share the next day.

The first two statements, relating to Playboy Online and Microsoft were not rendered misleading based upon K-tel's failure to disclose the receipt of the delisting letter. While the fact K-tel had received the delisting letter may have been material, no duty to disclose was triggered by the partnering statements. The delisting letter was unrelated to the subject matter of the statements.

K-tel's third statement, made by Kieves on CNBC, is so vague, cautionary and such obvious puffing that no reasonable investor would have relied on it. See Parnes, 122 F.3d at 547. Specifically, Kieves stated it would be "very premature" to announce anything more, a cautionary note rendering the statement immaterial as a matter of law. See id. at 548. Furthermore, Kieves seemed to describe tentatively the strategic partnerships which had already been announced by saying, "perhaps

-24-

partnering up with somebody in a strategic venture with regard to our sales." Such statements are not specific enough to perpetuate fraud on the market. See id. at 550. Furthermore, the statement does not implicate the delisting letter, nor was the immaterial statement made misleading without disclosure of the letter.

The financial results publicly disclosed on November 12, 1998, may have been rendered misleading by failure also to include notice of the delisting letter. At the very least, such would be a jury question. See Silver, 105 F.3d at 396. The subject matter is closely linked and underlying assumptions were at least colored by the letter. This determination does not end the discussion, however.

The Class argued the individual defendants, by reason of the material omission, were obligated to either disclose the letter or abstain from trading. In fact, the defendants did abstain from trading until the letter had been disclosed with the filing of the September 10-Q on November 16, 1998, just four days after the November 12, 1998, public disclosure of financial results. The complaint alleged no individual defendants sold shares between June 9, 1998, and November 17, 1998, and no other significant event or harm allegedly occurred within the four days between November 12 and 16.

Accordingly, we find, as a matter of law, failure to disclose the delisting letter prior to November 16, 1998, does not give rise to a "strong inference" of scienter.

### D. Motion to Amend

Finally, the Class contends the district court abused its discretion in denying the Class leave to replead its complaint for a third time. We find no merit in this argument.

Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be granted freely "when justice so requires." Fed. R. Civ. P. 15(a). "However, futility

constitutes a valid reason for denial of a motion to amend." Knapp v. Hanson, 183 F.3d 786, 790 (8th Cir. 1999). Generally, we review the denial of a motion to amend for abuse of discretion. Id. However, our review of the denial of leave to amend based upon futility is de novo where such denial is based upon the failure of the amended complaint to state a claim. See United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa, 269 F.3d 932, 936 (8th Cir. 2001).

In the present case, in denying the Class leave to amend, the district court stated the Class had failed, with nine months elapsing between the filing of the complaint and the amended complaint, to plead facts with sufficient particularity to raise a strong inference of scienter. Further, the district court, after a hearing on the matter, found insufficient evidence that the Class could cure the amended complaint. During the hearing, the Class told the court it had already alleged what it knew and admitted it could not plead certain claims with any greater precision.

The Class provides no further support for this court on appeal to explain how it would amend the complaint to add particularity. See Brandt v. Davis, 191 F.3d 887, 893 (8th Cir. 1999) (finding no abuse of discretion where party failed to "explain how he would amend the complaint to save the claim"); Wisdom v. First Midwest Bank, of Poplar Bluff, 167 F.3d 402, 409 (8th Cir. 1999) ("parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim").

Under the circumstances presented, we find the abuse of discretion standard is applicable because rather than find a specific allegation futile as a matter of law, the district court found it futile to amend where no actual amendments were possible. Therefore, we find the district court did not abuse its discretion in denying leave to amend the complaint. We would also affirm the denial of the motion to amend under the de novo standard.

## III.  CONCLUSION

Congress has obviously raised the pleading bar for securities fraud complaints. President William Clinton vetoed the Reform Act on December 19, 1995, because he disagreed with the intent of the Conference Committee in "erect[ing] a higher barrier to bringing suit than any now existing–one so high that even the most aggrieved investors with the most painful losses may get tossed out of court before they have a chance to prove their case." 141 Cong. Rec. S19035 (daily ed. Dec. 21, 1995) (veto message of President Clinton).  With the President's message in hand, Congress overrode the veto.

K-tel's motion to dismiss was properly granted.   Accordingly, we affirm the judgment of the district court.

MURPHY, Circuit Judge, dissenting.

I respectfully dissent.  The primary goals of the federal securities laws are to protect investors and to promote full disclosure of relevant information, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976), and there was no indication in the Reform Act that its purpose was to undercut those goals or to protect violators from meritorious claims.  Although pleading standards for securities fraud cases have been strengthened by the Reform Act, it does not require that a case be proven in the complaint or prevent a case from going forward to discovery when there are allegations that corporate insiders had enhanced motive and opportunity to commit fraud and knew facts suggesting that their public statements were materially inaccurate.  Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 661, 665 (8th Cir. 2001).

Many relevant facts in securities cases may not be discoverable at the pleading stage because they are known only by key insiders.  See In re Navarre Corp. Sec. Litig., No. 01-2543, slip op. at 14 (8th Cir. Jul. 31, 2002).  This can be especially true

-27-

if the alleged fraud concerns a special purpose business entity which does not appear on the corporate balance sheet as here. Whether or not appellants can ultimately prove their allegations, or even withstand an eventual summary judgment motion, is not at issue at this stage. The allegations in this case, especially those relating to the nature and timing of both the disclosure of corporate information and the insider trading, meet the new pleading standards and are sufficient to withstand a Rule 12(b)(6) motion.

## I.

The allegations in the amended complaint set out significant facts related to K-tel and its failed subsidiary. The sequence of alleged events in relation to each other and to the actions of appellees is of critical importance in determining whether the allegations are sufficient. For that reason it is necessary to recount the allegations here in considerable detail.

During 1997 the price of K-tel's shares ranged from $1.75 to $4.38, and K-tel formed a media buying and infomercial marketing subsidiary. The subsidiary accumulated significant losses by March 31, 1998, and appellees curtailed its operations at some point during 1998. Before any negative information about the subsidiary was reported, appellees announced in April, 1998 that they would undertake a promising online venture and a 2-for-1 stock split. K-tel's share price rose more than tenfold on the strength of these announcements, from $3.31 on April 9, 1998 to $33.94 on May 5, 1998.

Publicly traded companies like K-tel must file quarterly reports with the Securities and Exchange Commission (SEC) for each of the first three quarters of a fiscal year, and the reports are due within 45 days of the end of a quarter. 17 C.F.R. § 249.308a. For the quarter ending March 31, 1998, K-tel reported operating losses in a press release on May 5 and in a Form 10-Q filing on May 8. The May 8 filing

was the first of at least four consecutive SEC filings that reported quarterly operating losses. These losses were primarily due to the subsidiary, and K-tel's net tangible assets eventually declined below the minimum requirement for continued listing on Nasdaq. The filing on May 8, 1998, was K-tel's Form 10-Q for the quarter which ended March 31, 1998. It was signed by appellees Kives, Weiner, and Fischer, and it reported pre tax losses of $1,173,000 for the quarter, compared to pre tax gains of $492,000 in the same period of the previous year. It also reported that the subsidiary had accumulated losses of $1,300,000 and that most of its operations had been curtailed.

The amended complaint alleges that appellees knew at the time of the May 8 filing, or were reckless in not knowing, that the subsidiary had already sustained losses of $1,498,000 and that it was obligated to perform under contracts which would likely result in future losses of approximately $1.8 million. Appellants allege that the balance sheet contained in the filing overstated company earnings because it did not show actual or foreseeable losses. It is further alleged that these nondisclosures on the balance sheet allegedly enabled appellees to report net tangible assets of $4,949,000 and therefore to maintain the listing of K-tel's shares on the Nasdaq stock market. A company must have at least $4,000,000 in net tangible assets in order to remain listed, and delisting would have seriously impaired the liquidity and value of K-tel stock. On the day that appellees filed the March 10-Q, K-tel's stock closed at $31.44 per share.

In the month following the May 8 filing, which reported net tangible assets of approximately $5 million, four of the five corporate insider defendants named in the complaint[9] sold very large blocks of K-tel stock. Their sales amounted to approximately 32% of all outstanding K-tel stock (2,680,481 of 8,316,668 shares),

---

[9] It appears that Fischer and Weiner were never served with the amended complaint, but the district court treated them as parties and dismissed the action in respect to all named defendants.

and they reaped proceeds of over $40 million.  Kives, K-tel's chief executive officer and chairman of its board of directors, sold 2,202,303 shares for $26,312,153. Weiner, president of K-tel until his resignation in August, 1998, sold 390,000 shares for $11,755,420.  Fischer, chief financial officer, sold 6,000 shares for $195,660. Koblick, an executive vice president and director, sold 82,178 shares for $2,661,005. Kieves, the only individual appellee who did not sell stock during the May period, was a member of K-tel's board of directors at that time and became a manager only when he was appointed president in October, 1998.

From the allegations relating to the number of K-tel shares owned by the individual appellees and documents underlying the pleadings, percentages may be calculated about their transactions.  Kives sold approximately 39% of his entire holdings during this period at share prices ranging from $33.31 to $10.95.[10]  The other individual appellees sold at least 49% of their aggregate holdings[11] at share prices ranging from $34.25 to $22.51.  The daily closing price of K-tel's shares dropped from $33.22 to $11.25 during this period of insider trading.

The SEC requires publicly traded companies to file annual reports within 90 days of the end of a fiscal year, 17 C.F.R. § 249.310, and K-tel filed its annual report

---

[10] Kives owned approximately 42% of K-tel's 8,335,668 outstanding shares as of September 1998 (i.e. 3,500,980 shares).  At the beginning of May he owned 5,703,283 shares.  From May 8 to June 9, 1998, he sold 2,202,303 shares.  His sales during the May period thus liquidated approximately 39% of his holdings.

[11] The individual appellees other than Kives sold 478,178 shares during the May period.  As of September 11, 1998, the total number of shares held by affiliates of K-tel other than Kives was 555,313.  Fischer owned at least 24,000 of them because he liquidated that amount in November, 1998.  During the May period, the individual appellees other than Kives apparently liquidated from 49% to 95% of their aggregate holdings.

for the fiscal year ending June 30, 1998 on October 13, 1998.[12]  The October 13 filing was signed by Kives, Fischer, Koblick, and Kieves, and it was audited by the accounting firm of Arthur Andersen, LLP.  It reported a net operating loss of $2,407,000 for fiscal year 1998, as opposed to a gain of $3,204,000 for fiscal year 1997.  The annual report attributed K-tel's negative cash flow primarily to losses of the defunct media buying subsidiary and stated: "As of June 30, 1998, due to accumulated losses of $2,300,000, the Company had curtailed most of these media buying operations."  The October 13 filing also pegged K-tel's net tangible assets at $3,774,000, an amount below Nasdaq's $4,000,000 minimum requirement for continued listing.  K-tel's shares closed at $5.38 after the filing.

Key allegations in the amended complaint state that in April appellees announced a new venture and a stock split that increased the value of K-tel stock tenfold, and then sold off their own stock for millions of dollars in May and June. This was at a time that, according to statements by appellees, the subsidiary's operations had been curtailed although it was continuing to run up losses.  When appellees began to sell their stock immediately after they disclosed poor quarterly results on May 8, the accumulated losses and impaired assets of the subsidiary had not been accrued on K-tel's balance sheet.  Fiscal year results were released in October that revealed large operating losses and net tangible assets insufficient to remain listed on the Nasdaq market.  The pleadings, and reasonable inferences from them, thus allege a sequence in which insiders touted favorable information about the company, sold shares of their own, and only later revealed the true financial condition of K-tel.

---

[12] K-tel had received a two week extension of the filing deadline from the SEC on the ground that its receipt of material information from subsidiaries had been delayed.  The amended complaint alleges that the late filing was part of appellees' strategy to delay disclosure and hide K-tel's true financial condition.

A similar pattern is alleged for the fall of 1998, but with less insider trading. In November appellees publicly announced a strategic partnership with Playboy Online[13] and an agreement to include K-tel's online music store on The Microsoft Network's Shopping Channel.[14] More significantly, Kieves is alleged to have appeared on CNBC on November 10, 1998 when he stated that K-tel was "looking at several strategic opportunities...including most traditional financing options [including] a secondary offering...." These announcements drove K-tel's share price up from $6.88 to $32.63. Appellees issued a press release thereafter, on November 12, 1998, which projected losses for the quarter ending September 30, 1998.[15] K-tel's share price slid to $17.63 on November 16, 1998.[16]

During the week of October 19, 1998 K-tel received a letter from Nasdaq threatening to delist its shares, but appellees did not announce or disclose it until after business hours on November 16 when they filed K-tel's Form 10-Q for the quarter ending September 30, 1998.[17] The November filing was signed by appellees Kives, Kieves, and Fischer. It disclosed that "[t]he Company has been notified by the Nasdaq Stock Market that the Company failed to meet the minimum tangible net asset requirement necessary for continued listing on the Nasdaq National Market" and that "[t]here is no assurance that the Company will be successful in its attempt to remain listed...." The same report also showed net tangible assets of $912,000 and quarterly operating losses of $3,131,000. For the first time, the November 16 filing recognized

[13] A copy of the press release included in the record shows that Kives was quoted in it.

[14] Kieves was quoted in the press release.

[15] The press release quoted Kives and Kieves and listed Fischer as a contact.

[16] During this decline, defendant Koblick exercised options to purchase 27,200 shares at $3.06 per share.

[17] A transmittal sheet that accompanies the September 10-Q shows that the SEC received it at 7:11 p.m. on November 16, 1998.

an operating loss of $800,000 which had been incurred by the subsidiary for "write-offs of certain infomercials and remaining deferred media assets...because management determined such assets were not realizable."  Appellants allege that another operating loss of $698,000 due to the subsidiary was later recognized in K-tel's 10-Q for the quarter ending March 31, 1999.

The major news services reported K-tel's receipt of the delisting letter at approximately 11:30 a.m. on November 17, 1998.  K-tel's stock price immediately dropped 20% and was down 32% by the end of the day, at $12.00 per share.  Fischer sold 15,000 shares for $247,290 on the same day.[18]  His sales occurred at prices approximately midway between the daily high and the stock's closing price for the day.[19]  The exact time of the sales is not alleged and presumably unknown by appellants, but a possible inference is that the sell order could have been given before the disclosure even if the transaction occurred later.

The amended complaint alleges that appellees knew that the subsidiary's assets were impaired and that its losses were certain, but that recognizing those losses on K-tel's balance sheet would have lowered the company's stock price and threatened its continued listing on Nasdaq.  Appellees allegedly delayed recognition of these losses, in violation of Generally Accepted Accounting Practices (GAAP), and delayed disclosure of the Nasdaq delisting letter while publicly touting a new partnership and a new online venture.  It is alleged that the strategic nondisclosures kept K-tel's stock price artificially high while the individual appellees sold millions of shares in violation of § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and

---

[18] Fischer also sold 9,000 shares for $90,000 on November 18, 1998.

[19] The high price for the day was $21.25, and the closing price was $12.  The sales occurred at prices of $18.31 and $16.03.

related Rule 10b-5, 17 C.F.R. § 240.10b-5.[20]  Underlying the allegations in the amended complaint are four of K-tel's SEC filings, four company press releases from the period in question, and a graph of K-Tel's stock performance in calendar year 1998.  See Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999) (court may take notice of public documents in reviewing dismissal on pleadings).

## II.

In reviewing de novo a dismissal under Rule 12(b)(6), "we must assume all factual allegations in the complaint are true," and "the plaintiff is entitled to all reasonable inferences that may be drawn from the allegations of the complaint." Florida State Bd. of Admin., 270 F.3d at 660.  As to scienter, however, the sum of the reasonable inferences must be strong in order to proceed to discovery.  Id.  A complaint should only be dismissed for failure to state a claim if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997), quoting Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir.1982).

---

[20] The individual appellees are alleged to be liable as control persons under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and all of them except Kieves are alleged to be liable for selling securities while in possession of material nonpublic information in violation of § 20A of the 1934 Act, 15 U.S.C. § 78t-1.  The § 10(b) and Rule 10b-5 claims are predicates to § 20(a) liability, see Deviries v. Prudential-Bache Sec., Inc., 805 F.2d 326, 329 (8th Cir. 1986), and to § 20A liability, see Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir.1994).  These theories cannot go forward if the predicate claims are dismissed.

To state a violation of § 10(b)[21] or Rule 10b-5,[22] a plaintiff must allege: (1) a false statement or omission of material fact occurring in connection with the purchase or sale of a security; (2) scienter; (3) reliance; and (4) damages.  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1533-34 (8th Cir. 1996).  An omission occurs upon a breach of a duty to disclose, which arises if a statute or regulation requires it, if it is necessary to prevent a voluntary statement from being misleading, or if corporate insiders trade on confidential information.  See Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st Cir. 1987).  The parties do not dispute that the misrepresentations alleged in this case would be material if proven.  The questions on appeal are whether the pleadings sufficiently allege that appellees made false statements or omissions and whether they acted with scienter.

Each element of fraud must be pled with particularity.  See Fed. R. Civ. P. 9(b) (all elements of fraud except scienter must be pleaded with particularity); 15 U.S.C. 78u-4(b)(2) (in securities fraud action, scienter must be pled with particularity).  Nevertheless, our court has recently recognized that investors "need not plead...precise details...where the subject matter of the fraud is uniquely within the defendants' knowledge or control."  In re Navarre Corp., No. 01-2543, at 14.  In respect to the element of scienter, a plaintiff must plead facts "giving rise to a strong inference," 15 U.S.C. 78u-4(b)(2), that the defendant acted intentionally or recklessly.  Van Dyke v. Coburn Enterprises, Inc., 873 F.2d 1094, 1100 (8th Cir. 1989).

---

[21] Section 10(b) prohibits use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security "in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).

[22] Rule 10b-5 forbids any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

The amended complaint alleges that Kives, Weiner, and Fischer signed K-tel's March 10-Q on May 8, 1998 and that the filing was false and misleading because the balance sheet contained in it failed to recognize the subsidiary's losses and the impairment of its assets in violation of Statements of Financial Accounting Standards (SFAS) 121 and 5. The amended complaint thus identifies "who made the alleged announcement, where it was made, what it entailed, [and] when it was made." In re Navarre Corp., No. 01-2543, at 13. The issue on appeal is whether the amended complaint is deficient because it did not adequately plead "why it was false when made." Id.

The May 8 filing, signed by three appellees, states that the subsidiary had already incurred operating losses of $1,300,000 by March 31, 1998, and the October 13 filing, signed by four appellees, shows that the subsidiary incurred an additional $1,000,000 in operating losses between March 31 and June 30, 1998. While the May 8 filing claimed that the subsidiary's operations had been curtailed as of March 31, 1998, the October 13 filing stated that they were not concluded until June 30, 1998. The pleadings allege that appellees knew as of May 8 that the subsidiary's closure was imminent, that its losses and the impairment of its assets either had occurred or were reasonably certain to occur, and that appellees' failure to recognize any portion of these losses in the March 10-Q balance sheet was misleading and in violation of GAAP.

The accounting standards are designed to give a realistic picture of a company's financial condition. Robert S. Kay & D. Gerald Searfoss, Handbook of Accounting and Auditing, ch. 1, at 4 (2d ed. 1989). SFAS 121 "requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable." Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets To Be Disposed Of, Statement of Financial Accounting Standards No. 121, Summary (Financial Accounting Standards Bd.

-36-

1995).  SFAS 5 requires that a corporation disclose a loss contingency "when there is at least a reasonable possibility that a loss or an additional loss may have been incurred."  <u>Accounting for Contingencies</u>, Statement of Financial Accounting Standards No. 5, § 10 (Financial Accounting Standards Bd. 1975).  An estimated loss from a loss contingency "shall be accrued by a charge to income" if two conditions are met: (1) available information suggests that an asset has been impaired and it is probable that future events will confirm the loss, and (2) the amount of the loss can be reasonably estimated.  <u>Id.</u> at § 8.  These standards seek to bring relevant information to the market at the earliest opportunity.

The amended complaint alleges that by the time the March 10-Q was filed on May 8, losses incurred by K-tel's subsidiary had triggered a duty under SFAS 121 for the company to conduct an impairment review of its long term assets and identifiable intangibles and a duty under SFAS 5 to disclose an estimated loss from a loss contingency on the company's balance sheet.  It is also alleged that K-Tel had not curtailed most of its media buying operations as it later claimed in SEC filings, but that in fact K-Tel continued to be "obligated to perform under one or more contracts which were likely to result in additional future losses of approximately $1.8 million."  The district court believed that the allegations were not pled with sufficient particularity because they did not include the terms of the alleged contracts and did not specify that the subsidiary or any of its property was a "long-lived asset" or an "identifiable intangible," that the sum of any future cash flows was less than the asset's carrying amount, or that future losses from the asset were inevitable.

The accounting standards are not bright line rules, and application of them requires judgment calls.  <u>See</u> <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87, 100 (1995), <u>citing</u> Kay & Searfoss, ch. 5, at 7.  The nature of accounting makes it unreasonable to expect securities fraud plaintiffs to plead GAAP violations with the most exacting particularity, especially "where the subject matter of the fraud is uniquely within the defendants' knowledge or control."  <u>In re Navarre Corp.</u>, No. 01-

2543, at 14. The allegations here concern operations of and accounting for an off balance sheet corporate entity so only insiders would normally have access to the relevant information. A subsidiary engaged in media buying and infomercial marketing might be presumed to own identifiable intangible assets such as copyrights, licenses, or record masters, see Kay & Searfoss, ch. 15, at 35-36, as well as long term assets such as equipment, see id., ch. 15, at 2. The allegation that the subsidiary was obligated to perform under unprofitable contracts should be considered together with other allegations relating to the losses reported after the subsidiary's operations were shut down. It is not an unreasonable inference that losses occurring after closure resulted from preexisting obligations, and reasonable inferences arising from the amended complaint must be regarded as true at this stage of the case. Florida State Bd. of Admin., 270 F.3d at 660.

A securities fraud complaint need not allege GAAP violations to establish that a material misstatement occurred in a company's financial statement. The accounting standards and the requirements of Rule 10b-5 are not "perfectly coextensive." Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir. 1994). Compliance with GAAP does not provide immunity from 10b-5 liability, id. at 478, and accountants have been held criminally liable for certifying false or misleading financial statements even though they followed GAAP. United States v. Simon, 425 F.2d 796, 805-06 (2d Cir. 1969). Without discovery plaintiffs have not had access to detailed information about K-tel's business units, their assets, or their operations, and it is not necessary at this stage to plead accounting irregularities with greater specificity than was done by the plaintiffs here. See In re Navarre Corp., No. 01-2543, at 14, 15. The amended complaint alleges facts sufficient to show that K-tel's publicly filed balance sheets potentially contained material misstatements or omissions under Rule 10b-5.

The amended pleadings in this case identified specific statements attributable to appellees that allegedly inflated K-tel's earnings and net tangible assets by hiding specific losses that were also identified. Appellants have not relied on generalized

imputations of scienter based on the individual appellees' positions within the corporation, cf. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3rd Cir. 1999), nor is this a case where the pleadings repeatedly fail to show who made the alleged misstatement, when it was made, where it was made, what it entailed, and why it was false. Cf. In re Navarre Corp., No. 01-2543, at 14-15. Appellants here have alleged that each individual appellee signed at least one of K-tel's SEC filings which blamed the subsidiary for K-tel's poor performance and yet failed to recognize its losses or the impairment of its assets on the balance sheet in violation of GAAP.

The amended complaint also alleges that K-tel breached its duty to disclose the delisting letter, a duty which arose when appellees made November announcements touting the company. The majority claims that the delisting letter was unrelated to the subject matter of any of the November announcements, but a delisting directly impairs a publicly traded company's ability to raise capital and is therefore highly relevant to any public statement concerning capitalization or financing. Kieves allegedly appeared on CNBC on November 10, 1998 and discussed the company's consideration of "most traditional financing options [including] a secondary offering," and a finder of fact could conclude that Kieves had a duty to disclose K-tel's receipt of the delisting letter at that time. The majority states that failure to disclose the delisting letter in the November 12 press release may have created a jury question, but it then reaches the puzzling conclusion that failure to disclose it before November 16 is insufficient as a matter of law to permit the case to go forward. The nondisclosure of the delisting letter may not have impacted most of the insider sales, but it contributes to a reasonable inference that appellees acted deliberately to inflate K-tel's share price artificially.

The Reform Act "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000) (emphasis in

original).  Our court requires that "investors must plead with particularity the who, what, when, where, and how of [an] alleged scheme," In re Navarre Corp., No. 01-2543, at 15, and appellants here have met that burden.  The amended complaint alleges facts from which it could be inferred that appellees knew, or had reason to know, that the balance sheet in K-tel's May 8 filing was false when made and that Kieves' November 10 discussion of K-tel's financing options was misleading at the time.

III.

The new pleading standards require a securities fraud plaintiff to "state with particularity facts giving rise to a strong inference" that a defendant acted with scienter, 15 U.S.C. 78u-4(b)(2).  One important way to demonstrate a strong inference of scienter is to make a showing of heightened motive and opportunity to commit fraud.  Florida State Bd. of Admin., 270 F.3d at 660.  An unusually large executive compensation package is one indication of heightened motive and opportunity, id. at 661, and an unusual pattern of insider trading is another.  Id. at 656.  See also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001); Rothman v. Gregor, 220 F.3d 81, 94 (2d Cir. 2000).  "[I]n the insider trading case, trading at a particular time is circumstantial evidence that the insider knew the best time to trade because he or she had inside information not shared by the public.  This in turn is circumstantial evidence that he or she kept the information from the public in order to trade on the unfair advantage."  Florida State Bd. of Admin., 270 F.3d at 656.  Whether a pattern of insider trading is unusual depends upon such factors as the timing of the sales, the percentage of stock holdings sold, the amount of profit derived from them, and the number of insiders selling.  Id. at 659.  See also In re Scholastic, 252 F.3d at 74-75.

The amended complaint alleges sufficient facts to show the insider sales here to be suspicious in each of the ways identified by Florida State Bd. of Admin.  During

-40-

the class period, four of five individual appellees are alleged to have sold between 39% and 95% of their holdings at a time when the alleged nondisclosures could have artificially inflated the share price so that sales proceeds amounted to more than $41 million. Kives sold 39% of his holdings and received approximately $26 million on his sales. His individual codefendants apparently sold at least 49% of their aggregate holdings for approximately $15 million. An inference may be drawn from the allegations that the motive for these sales was personal profit rather than any institutional need.

This is not a case where only a single insider benefitted, see, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir. 1996), or where a significant number of insiders have not benefitted at all. See In re Advanta Corp., 180 F.3d at 540 (inference weakened when only four of seven individual defendants traded); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (inference undermined when only one of four individual defendants traded). Kives may have benefitted the most, but the allegations on motive are not undercut by the fact that different appellees profited unequally from the alleged scheme. Florida State Bd. of Admin., 270 F.3d at 664-65. It is not suspicious for an insider to sell a relatively small percentage of his holdings, see Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (17% not suspicious); Acito, 47 F.3d at 54 (11% not suspicious); Rothman, 220 F.3d at 95 (9.3% not suspicious), but when a larger percentage is sold the timing of the sales is critical to determine whether they contribute to a strong inference of scienter.

It is suspicious when insider sales occur at a time when alleged nondisclosures could have artificially inflated the stock's price, see In re Navarre Corp., No. 01-2543, at 19, and that is what is alleged here. The vast majority of the sales began when K-tel's share price was approximately $31.44 on May 8, 1998, a price nearly ten times higher than before appellees had made their announcements of a new online venture and stock split, and nearly equivalent to the stock's 1998 high of $33.94 which

-41-

occurred on May 5, 1998. The sales occurred immediately after the alleged nondisclosures and at the beginning of a prolonged period of operating losses and diminishing net tangible assets.

This is not a case in which the timing of the sales undercuts the allegations of fraud, and the insider sales here did not occur before the alleged fraud took place, see In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) (38% not suspicious because majority of sales occurred before fraud could have occurred), or at a particularly disadvantageous time within the class period, see Ronconi, 253 F.3d at 435 (69% not suspicious because sales occurred near lowest point in stock price during class period). In contrast, the insider sales here occurred when the share price was near its peak, at the time when the alleged fraudulent scheme to suppress unfavorable information would have had the most significant impact on that price.

The situation here is not unlike the Second Circuit case Stevelman v. Alias Research Inc., 174 F.3d 79 (2d. Cir. 1999). A president and CEO in that case sold 40% of his company holdings for $3.5 million, and several other insiders liquidated unknown percentages of their holdings. Id. at 82. The trading was done during the same period that the insiders were alleged to have overstated corporate earnings. Id. at 82, 85. The court concluded that "the insider trading alleged...in combination with the timing of the misrepresentations, satisfies the pleading requirements of Rule 9(b) for the purposes of the scienter element of section 10(b) and Rule 10b-5." Id. at 86. The magnitude and the timing of insider trading alleged here is similarly suspicious. Kives sold 39% of his holdings for approximately $26 million, and his codefendants apparently sold at least 49% of their aggregate holdings for approximately $15 million, during the time they are alleged to have overstated K-tel's net tangible assets.

The allegations of insider sales at K-tel reflect transactions greater in magnitude and more suspicious in timing than the insider sales deemed "unusual" in In re Navarre Corp., No. 01-2543, at 19 (all six individual defendants sold between

10% and 100% of their holdings for $11.5 million). The pleadings in that case were insufficient to establish a strong inference of scienter from insider trades because they did not allege misrepresentations with particularity. Id. at 20. There is no such "missing link" in the allegations here. Id. Appellants have pled the who, what, when, where, and how of the alleged fraud, and the magnitude and timing of the insider sales in this case buttress the inference that appellees' filings contained intentional or reckless misstatements. See Florida State Bd. of Admin., 270 F.3d at 660 ("[I]n some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless.").

In the year before the class period, K-tel stock never closed at a price higher than $4.38 per share. During the class period, appellees publicly touted online ventures that dramatically raised share prices, sold large portions of their holdings at prices ranging from $10.95 to $34.25, and lagged in disclosing unfavorable financial information which eventually led to and included the delisting letter.

A securities fraud action cannot proceed on "GAAP violations or accounting irregularities, standing alone," Novak, 216 F.3d at 309, but appellants here have alleged far more. Our court has determined that allegations relevant to the scienter issue include "insider trading in conjunction with false or misleading statements;...disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest." In re Navarre Corp., No. 01-2543, at 20, quoting Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001). Appellants have made detailed allegations of each of these factors sufficient to survive a motion to dismiss.

IV.

The Securities Exchange Act of 1934 was enacted in part because securities prices "are susceptible to manipulation and control...resulting in sudden and unreasonable fluctuations." 15 U.S.C. § 78b. It was intended to protect investors from fraud and to promote disclosure of information. Hochfelder, 425 U.S. at 194. Congress did not abandon these overarching objectives when it passed the Reform Act, and "[o]ur willingness to draw inferences in favor of the plaintiff remains unchanged" under the new pleading standards. Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001) (en banc). "While Congress unquestionably strengthened the pleading standard for securities fraud, the Reform Act would hardly serve its purpose 'to protect investors and to maintain confidence in the securities markets' were it to become a choke-point for meritorious claims." Id., quoting H.R. Conf. Rep. No. 104-369, at 31 (1995), U.S. Code Cong. & Admin. News at 730.

The amended complaint must be viewed in the light most favorable to appellants. Parnes, 122 F.3d at 546. It alleges that appellees signed SEC filings which linked K-tel's poor financial performance to the subsidiary's losses as early as March 31, 1998. Although appellees are alleged to have known about these losses, they nevertheless delayed recognizing them on K-tel's balance sheet for a number of months. During that time they sold large blocks of company stock for approximately $41 million. Although corporate officials "need not be clairvoyant" and "are only responsible for revealing those material facts reasonably available to them," Novak, 216 F.3d at 309, the corporate insiders here have been charged in the amended complaint with actual knowledge of the subsidiary's material losses and the receipt of a delisting letter at the time when they signed K-tel's various public filings. Some securities fraud complaints give "no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation," but the allegations here strongly suggest that the May 8 filing and Kieves' November

10 statements were "misleading <u>when made</u>." <u>City of Philadelphia v. Fleming Cos., Inc.</u>, 264 F.3d 1245, 1260 (10th Cir. 2001) (emphasis in original).

A fundamental principle of accounting is that losses must be recognized as soon as they are reasonably certain and measurable, Kay & Searfoss, Ch. 2, at 8-13, and the amended complaint alleges with sufficient particularity that appellees failed to do this. The nature and timing of the alleged nondisclosures, together with the magnitude and timing of appellees' stock sales, meet the heightened pleading requirements of the Reform Act. <u>See</u> <u>Florida State Bd. of Admin.</u>, 270 F.3d at 661 (strong inference of scienter based on magnitude of executive compensation package and timing of alleged misstatements); <u>Stevelman</u>, 174 F.3d at 86 (strong inference of scienter based on magnitude of insider sales and timing of alleged misstatements). <u>Cf.</u> <u>Novak</u>, 216 F.3d at 309 (strong inference of scienter when corporate insiders allegedly delayed markdowns of worthless inventory).

For these reasons the dismissal by the district court should be reversed, and the case remanded for discovery and further proceedings.[23]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[23] The district court denied appellants' request for leave to amend the amended complaint on the ground that any attempt to cure its defects would be futile. The record here does not suggest that appellants acted in bad faith or were dilatory in filing the amended complaint, for they filed it within three months of the order appointing them lead plaintiffs in the case. Any delay must have been prejudicial to the opposing side to justify denial of leave to amend, <u>Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 644 F.2d 690, 694 (8th Cir. 1981), and the record does not reflect prejudice.