In re HUTCHINSON TECHNOLOGY
INC. SECURITIES
LITIGATION.

No. 05–CV–2095 (PJS/JJG).

United States District Court,
D. Minnesota.

June 4, 2007.

Trig R. Smith, Thomas E. Egler, Mario Alba, Jr., Eric I. Niehaus, and David A. Rosenfeld, Lerach Coughlin Stoia Geller Rudman & Robbins LLP; and Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St. Paul, MN, for lead plaintiff NECA–IBEW Pension Fund.

Wendy J. Wildung and Ahna M. Thoresen, Faegre & Benson LLP, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS

SCHILTZ, District Judge.

Plaintiffs bring this securities-fraud action against defendant Hutchinson Technology, Inc. ("Hutchinson") and six of Hutchinson's officers and directors: Jeffrey W. Green, chair of the board of directors; Wayne M. Fortun, president and CEO; John A. Ingleman, vice president and CFO; Richard J. Penn, vice president of operations; R. Scott Schaefer, vice president and chief technical officer; and Beatrice A. Graczyk, vice president of business development. Plaintiffs allege that defendants engaged in a fraudulent scheme to artificially inflate Hutchinson's stock price between October 4, 2004, and August 29, 2005 ("the class period"). In rough outline, this scheme involved hiding the fact that Hutchinson was producing defective products at increasing rates and was unable to keep up with strong customer demand for its products. Plaintiffs allege that this scheme began in October 2004 with Hutchinson's announcement that, because of strong demand, it expected to exceed its 4Q04 guidance, and unraveled in July and August 2005, when Hutchinson disclosed (in July) that "capacity constraints" would prevent it from meeting its 3Q05 shipment projections and (in August) that customer demand was weakening. Plaintiffs allege that these disclosures in July and August 2005 exposed the fraudulent scheme and caused Hutchinson's stock price to plummet.

Plaintiffs bring claims of securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and under the SEC's implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs also bring claims of controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t. Plaintiffs sue on behalf of themselves and all those who purchased Hutchinson common stock during the class period.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim. For the reasons set forth below, defendants' motion is granted, and plaintiffs' consolidated class-action com-

plaint [Docket No. 34] is dismissed with prejudice.

## I. BACKGROUND

Hutchinson is a leading manufacturer of suspension assemblies for all sizes and types of computer hard disk drives. Suspension assemblies are sophisticated components that hold read and write heads above a disk as it spins, enabling the storage and retrieval of data on the disk. There is very little room for error in manufacturing suspension assemblies; small defects can interfere with the goal of maintaining an exact clearance between the heads and the disk. If the heads are positioned too close to the disk, they may strike the disk's surface and destroy data; if the heads are positioned too far from the disk, their ability to read and write data is impaired. Sales of suspension assemblies account for over 90% of Hutchinson's revenues, and the company supplies many major disk drive manufacturers, including Seagate Technology LLC, Western Digital Corp., SAE Magnetics, Ltd./TDK, Alps Electric Co., and Innovax, Inc.

### A. Hutchinson's Public Statements During the Class Period

In 2004 and 2005, industry analysts predicted that demand for suspension assemblies would increase over the next several years. On October 4, 2004 (the first day of the class period), Hutchinson reported that it expected to exceed its guidance for 4Q04 (which ended on September 26) and that it expected demand to increase in 1 Q05. Compl. ¶ 45. After this announcement, Hutchinson's stock price increased from $30.93 to $34.09. Compl. ¶ 46.

On November 1, 2004, Hutchinson released its financial results for 4Q04. The company reported earnings per share ("EPS") of $0.18, which was in line with its October prediction of EPS between $0.15 and $0.20. (Earlier, in July 2004, the company had forecast EPS of, at best, $0.10.) Compl. ¶¶ 45, 47. On the same day, Fortun and Ingleman hosted a conference call for investors and analysts during which Fortun said, "Overall, we continue to expect suspension assembly demands to trend upward." Compl. ¶ 48. Nevertheless, Hutchinson's stock price declined, to around $30.00 per share. Compl. ¶ 50 & Ex. A. Several days later, after the stock price declined even further, Fortun, Ingleman, Graczyk, Schaefer, and Penn sold a combined total of 137,750 shares of stock for net proceeds of nearly $6 million, at prices ranging from $29.04 to $30.02 per share. Compl. ¶ 50 & Ex. A.

On December 9, 2004, Hutchinson filed its FY04 Form 10–K with the SEC. The 10–K reiterated the company's previously announced financial results and disclosed that Hutchinson had increased the allowance for sales returns by $1,327,000 for 4Q04 and $3,797,000 for FY04. Compl. ¶ 51. (The allowance for sales returns, or "return allowance," is based on the company's estimate of the amount of product that customers will return.) These increases were smaller than the increases Hutchinson reported for 4Q03 and FY03. Compl. ¶ 51. The Form 10–K also contained Fortun's and Ingleman's signed Sarbanes–Oxley certifications.[1]

---

1. Under §§ 302 and 906 of the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 7241 and 18 U.S.C. § 1350, companies filing financial reports with the SEC must have their principal executive and financial officers certify, among other things, that the signing officers have reviewed the report; that the report does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made not misleading; that the report fairly presents the financial condition and results of the company; and that the signing officers have designed and evaluated the company's internal controls to ensure that they are aware of material information about the company.

On January 10, 2005, Hutchinson announced that it had exceeded its 1 Q05 shipment guidance, and on January 20, Hutchinson released its 1 Q05 financial results. On both occasions, Fortun said that demand was stronger than the company had anticipated. Compl. ¶¶ 55, 57. Fortun also reported that Hutchinson was "operating at close to full capacity" and that "[we are] struggling to figure out how we're going to meet the general demand requirements and build some inventory at the same time.... [W]e don't know if we're going to necessarily make that happen." Compl. ¶ 58. Several days later, Graczyk and Schaefer sold a combined total of 26,820 shares for net proceeds of almost $1 million. Compl. ¶ 60. Hutchinson filed its 1Q05 Form 10–Q on February 3, 2005, containing its previously announced financial results and Fortun's and Ingleman's Sarbanes–Oxley certifications. Compl. ¶¶ 61–62. The Form 10–Q reported that Hutchinson increased its return allowance by $745,000, which was less than the amount the allowance had increased in 1Q04. Compl. ¶ 61.

On March 31, 2005, Hutchinson announced that it had again exceeded its earlier shipment guidance, this time for 2Q05. Compl. ¶ 65. Fortun reported that demand grew steadily through 2Q05 and that Hutchinson planned to increase its production capacity from 15 million units per week to 20 million units per week. Compl. ¶ 65. To accomplish this, Fortun said, Hutchinson intended to increase its FY05 capital-spending budget from $120 million to $220 million. Compl. ¶ 65.

Hutchinson released its 2Q05 financial results on April 21, 2005, and again reported that demand was up. The company forecasted shipments in 3Q05 from 190 to 200 million units and net sales of $175 to $185 million. Compl. ¶ 66. During an investors' conference call that same day, Fortun said, "We believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months." Compl. ¶ 67. Fortun also said, "We have been on a forced march since about mid-November last year. We have not been able to hold inventories to where they need to be.... We're going to have to really scramble to stay with it." Compl. ¶ 67. Hutchinson's stock price increased to $36.93 the next day. Compl. ¶ 69. On April 26, Graczyk sold 19,670 shares of Hutchinson stock for net proceeds of around $750,000. Compl. ¶ 72. Hutchinson filed its 2Q05 Form 10–Q on April 27, containing its previously announced financial results and Fortun's and Ingleman's SarbanesOxley certifications. Compl. ¶¶ 70–71. The Form 10–Q reported that Hutchinson increased its return allowance by $824,000, which was more than the amount the allowance had increased in 2Q04.[2] Compl. ¶ 70.

*B. The Disclosure of the Alleged Fraud*

Toward the end of the class period, on July 21, 2005, Hutchinson announced that it had missed its 3Q05 shipment projections because of "capacity constraints," and only met its net income projection for the quarter because it received a tax refund. Compl. ¶¶ 75–76. Hutchinson noted that "inefficiencies resulting from operating at peak capacity while bringing new units into production" as well as "higher costs for expedited production and shipping" kept its gross margin down for the quarter. Compl. ¶ 77. Nevertheless, the company reported that its shipments and

---

**2.** The complaint alleges that Hutchinson's 2Q05 increase in the return allowance was $79,000. Compl. ¶ 70. At oral argument, plaintiffs admitted that this figure is incorrect, and that the actual reported increase for 2Q05 was $824,000. Hr'g Tr. 41–42, Oct. 27, 2006 [Docket No. 53].

sales price had increased compared to both the previous quarter and 3Q04, that demand remained strong, and that it expected increased sales in 4Q05. Compl. ¶¶ 76–78. The next day, Hutchinson's stock price declined from $37.90 to $32.99. Compl. ¶ 79. A few days later—that is, *after* the market had absorbed the negative information and *after* Hutchinson's stock price had declined substantially—company insiders Fortun, Ingleman, and Green sold a combined total of 154,300 shares of Hutchinson stock for net proceeds of over $5 million. Compl. ¶ 80.

A month later, on August 30, 2005 (one day after the end of the class period), Hutchinson issued a press release revising its 4Q05 financial projections. Among other things, Hutchinson announced that weak demand and a shift in demand toward its newer products (which have a lower "yield" or productivity rate) would significantly reduce 4Q05 sales and earnings. Compl. ¶ 81. After this announcement, Hutchinson stock dropped from $31.51 to $26.16. Compl. ¶ 82.

### C. Hutchinson's Manufacturing Problems During the Class Period

Plaintiffs allege that, by October 2004, when Hutchinson first announced that demand was strong and that it expected to exceed its 4Q04 guidance, Hutchinson was operating at peak capacity and its defect rate was increasing at more than twice the rate of its increases in production capacity. Compounding the problem, plaintiffs claim, Hutchinson's customers were ordering more of its newer suspension assemblies, which had higher production costs and correspondingly lower profit margins.

The complaint includes allegations from five confidential witnesses (CWs), who claim that Hutchinson's customer-return and product-defect rates were rapidly increasing during the class period. CW1, a manufacturing supervisor at Hutchinson's Sioux Falls plant, observed a significant increase in the product-defect rate beginning in May 2005. According to CW1, Hutchinson customers returned approximately one million units per week to the Sioux Falls plant from May 2005 until his employment ended in December 2005, and Hutchinson's customer-return rate increased 75% in the six months preceding May 2005. Only about 50% of the returned products were reusable. By June 2005, CW1 claimed, the Sioux Falls plant began missing its production quotas. Compl. ¶ 43(a).

According to CW2, a quality-engineering manager at Hutchinson's Plymouth plant, Hutchinson added 10% additional capacity each quarter from November 2004 through June 2005. During this same period, CW2 said, Hutchinson's product-defect rate increased from 8% to 15% of total units produced. CW2 said that the plant managers created "weekly activity reports" detailing the plant's production for the week that were e-mailed to defendant Penn, the vice president of operations. If there were any production problems, the plant manager was supposed to analyze the "root cause" and describe what steps were being taken to correct the problem. Compl. ¶ 43(b).

According to CW3, a plant manager at Hutchinson's Plymouth plant who reported directly to Penn, the plant managers were responsible for creating weekly quality-control reports that included information about yield rates, scrap rates, quality-control issues, and production problems. Penn's staff consolidated the weekly reports from all of Hutchinson's plants into one report, which was then forwarded to all the plant managers and was available on the company's computer system. CW3 cited as an example of Hutchinson's increasing production problems the return by one of Hutchinson's major customers of approximately a half million units per

week over the course of a month in the fall of 2004. Compl. ¶ 43(c).

CW4, a human resources manager at the Eau Claire plant, participated in weekly conference calls with Fortun, Penn, Graczyk, Ingleman, and Schaefer during which the participants discussed the week's production. According to CW4, the calls focused on the "weekly plant manager review report," which plaintiffs allege is most likely the same report described by CW2. This report was provided to all of the conference-call participants. According to CW4, the weekly reports and conference calls alerted defendants to the fact that, for each 10% increase in production capacity, Hutchinson experienced a 22.5% increase in the product-defect rate. Compl. ¶ 43(d). As a result, plaintiffs allege, all of the defendants were aware of Hutchinson's production problems during the class period.

Finally, CW5, a human resource generalist at Hutchinson's Eau Claire plant, said that the Eau Claire plant experienced an "obvious" increase in the product-defect rate during the class period. Compl. ¶ 43(e).

## II. ANALYSIS

Plaintiffs bring claims of securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, as well as claims of controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

Section 78j states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j). Rule 10b–5 states, in turn:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

 To establish their securities-fraud claims under § 78j(b) and Rule 10b–5, plaintiffs must prove (1) misrepresentations or omissions of material fact, or acts that operated as a fraud or deceit; (2) causation; (3) scienter; and (4) economic harm. *In re K–tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 888 (8th Cir.2002). To prevail on their 15 U.S.C. § 78t controlling-person-liability claims, plaintiffs must first establish a separate underlying violation of the 1934 Act. *See Deviries v. Prudential–Bache Secs., Inc.,* 805 F.2d 326, 329 (8th Cir.1986). If plaintiffs cannot maintain their § 78j(b) and Rule 10b–5 securities-fraud claim, then they also cannot pursue their § 78t claim.

## A. Standard of Review

Ordinarily, in reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the claimant's favor. *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir.2003). But because this is a private securities-fraud action, the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b), modifies the Rule 12(b)(6) standard in two important ways.

■ First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). This means that plaintiffs must specifically allege such matters as the time, place, and contents of false representations, as well as who made each misrepresentation. *K–tel*, 300 F.3d at 890.

■ Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "Strong" means "strong." Under the Reform Act, it is not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter; instead, the facts alleged must give rise to a strong inference that the defendants acted with the required state of mind. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir.2003); *Fla. State Bd. of Ad-*

*min. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir.2001).

■ Under these provisions of the Reform Act, the court disregards "catch-all" or "blanket" assertions that do not satisfy the particularity requirements of the Reform Act. *Green Tree*, 270 F.3d at 660. If the complaint fails to satisfy these requirements, it must be dismissed. 15 U.S.C. § 78u–4(b)(3).

## B. Materially False or Misleading Statements

Plaintiffs allege that defendants made two types of false and misleading statements during the class period. First, plaintiffs allege that the financial results Hutchinson reported during the class period were false and misleading because Hutchinson's return allowances were too small. Second, plaintiffs allege that the individual defendants—particularly Fortun and Ingleman—made false and misleading statements during the class period regarding customer demand and Hutchinson's ability to meet it.

### 1. Return Allowance

According to plaintiffs, Hutchinson should have booked higher return allowances during the class period, and its failure to do so violated generally accepted accounting principles ("GAAP"). Specifically, plaintiffs allege that Hutchinson violated Financial Accounting Standard No. 5, "Accounting for Contingencies" ("FAS No. 5"). According to plaintiffs, Hutchinson's return allowance in 4Q04 was 22.5% lower than it should have been, the return allowance in 1Q05 was 168.5% lower than it should have been, and the return allowance in 2Q05 was 191% lower than it should have been. Compl. ¶¶ 53(g), 63(g), 73(g).[3] Plaintiffs allege that, because the

---

3. Plaintiffs informed the Court at oral argument that, due to the erroneously stated return allowance in ¶ 70 of the complaint, the percentage difference between what Hutchin-

son reported as its return allowance in 2Q05 and what it should have reported is 191 %,

return allowances were too low, Hutchinson's earnings were overstated.

FAS No. 5 requires an estimated loss from a "loss contingency" to be accrued by a charge against income if two conditions are met: (1) information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability incurred as of the date of the financial statement; and (2) the amount of loss can be reasonably estimated. FAS No. 5 ¶ 8. A "loss contingency" is an uncertainty as to a possible loss. For example, obligations related to product warranties and defects are considered loss contingencies. FAS No. 5 ¶¶ 1, 4. FAS No. 5 indicates that estimating the amount of loss contingencies related to product warranties and defects "will normally depend on. the experience of an enterprise or other information." FAS No. 5 ¶ 25.

In this case, plaintiffs focus on the return-allowance increases during the class period—in particular, in 4Q04, 1 Q05, and 2Q05—and argue that, because those increases were generally smaller than the increases in the comparable quarters in the previous year, the class-period increases were inadequate.[4] Plaintiffs base this argument on their allegations that the customer-return and product-defect rates were rapidly increasing during the class period. The fact that the quarterly return allowances were not also increasing at a rate higher than they had in the previous year demonstrates that they were inadequate, according to plaintiffs.

■ Plaintiffs' argument does not work with respect to the 2Q05 return allowance, as plaintiffs have now admitted that the increase for that quarter was indeed larger

than the increase for 2Q04. Compl. ¶ 70; Hr'g Tr. 41. Oddly, though, plaintiffs continue to identify the 2Q05 return allowance as the most understated of the three quarters at issue, without providing any explanation or factual support for doing so. "[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417–18 (3d Cir.1997) (Alito, Circuit Judge). The fact that the 2Q05 return-allowance increase was actually larger than the 2Q04 return-allowance increase deprives plaintiffs of their only factual basis for arguing that the 2Q05 return allowance was improper. Without that factual basis, plaintiffs offer nothing but a bare allegation of inadequacy, which is insufficient under the Reform Act.

■ Plaintiffs' allegations with respect to the 4Q04 and 1Q05 return allowances are also defective. The complaint contains anecdotal information about specific customer returns during those quarters, but it offers virtually nothing in the way of historical context—that is, virtually nothing to put the returns into perspective or to suggest that they were outside of the normal fluctuations of the business. *Cf. In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 549 (8th Cir.2004) (Wollman, Circuit Judge, concurring) ("At best, the facts alleged show that one or two projects were not going well, that one geographic sector of Amdocs' business was underperforming, that some offices were experiencing layoffs, and that some employees were unhap-

---

and not the 3100% alleged in ¶ 73(g). Hr'g Tr. 42.

**4.** In ¶ 51 of the complaint, plaintiffs compare the allowance increases for FY03 and FY04,

but they do not appear to rely on overall FY04 results in alleging that defendants made false and misleading statements. *Cf.* Compl. ¶ 53(g) (discussing 4Q04 results, but not FY04 results).

py."). Plaintiffs repeatedly emphasize that Hutchinson experienced a 22.5% increase in the product-defect rate for each 10% increase in production capacity, resulting in an overall increase in the product-defect rate from 8% to 15% during the class period. But plaintiffs offer no facts putting these increases in context; for example, they offer no evidence that the increase in the product-defect rate was out of line with what Hutchinson normally experienced when it was adding production capacity. More importantly, plaintiffs offer no evidence of the extent to which an increased product-defect rate translated into increased customer returns.

■ Plaintiffs' sole specific allegation of an actual increase in the customer-return rate (as opposed to mere anecdotal information about certain customer returns) is CW1's claim that customer returns increased 75% from late 2004 through May 2005. CW1 was a manufacturing supervisor at a single plant (the Sioux Falls plant) during the class period. The complaint does not allege how CW1 would have any knowledge of the company-wide return rate; for example, there is no allegation that CW1 saw reports or attended meetings discussing such a return rate, or that CW1 received information about such a return rate from the individual defendants or any other upper-level managers. *Cf. Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149 (3d Cir.2004) (criticizing the plaintiffs' reliance on "low-level, locally sited former employees" with no explanation of how or why such employees would have knowledge about the company as a whole).

Notably, the complaint contains no allegation that the return allowances ultimately proved to be inadequate in light of actual customer returns.[5] *Cf. In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir.2005) (noting the absence of "any fact alleged in the complaint that indicated that [the corporate defendant]'s reserves were inadequate" even under the more liberal Fed.R.Civ.P. 8 standard applicable to 15 U.S.C. § 77k claims). Of course, the mere fact that returns exceeded return allowances would provide little, if any, evidence that the return allowances were knowingly false. After all, return allowances are estimates, and even the most honest and careful estimate will often turn out to be wrong. But plaintiffs have not even alleged that, in this case, the returns *did* materially exceed the return allowances. Instead, plaintiffs are relying entirely on their confidential witnesses to provide the factual backbone for their allegations of inadequacy. Without any allegations showing the basis of CW1's knowledge, plaintiffs' claim that the return allowances were inadequate because of rising customer returns does not meet the standards of the Reform Act.

■ A separate problem with plaintiffs' complaint is that plaintiffs have not alleged—or at least not alleged with sufficient particularity—how defendants should have calculated the return allowances. Plaintiffs throw out numbers—they allege that the return allowances should have increased by an additional 22.5%, 168.5%, and 191% in the three quarters at issue—but they do not explain how they came up with those numbers. *Cf. K–tel*, 300 F.3d at 893 (finding the plaintiffs' allegation that the defendants violated FAS No. 5 insufficiently particular because "[m]erely stating a particular dollar amount without a corresponding source or basis is insufficient under the Reform Act"); *Chubb*, 394

---

**5.** Plaintiffs submitted additional materials, at oral argument and afterwards, purporting to show that Hutchinson's return allowances turned out to be inadequate. The Court will discuss those materials in connection with plaintiffs' request for leave to amend the complaint.

F.3d at 152 (finding allegations of overstated financials insufficiently particular because the plaintiffs did not plead the data that they used to calculate the allegedly correct figure).

 Finally, although defendants do not make this argument, it also appears to the Court that plaintiffs' failure to provide an adequate factual predicate for their calculations means that plaintiffs have failed to allege that the reported numbers, even if false or misleading, were *materially* false or misleading. For example, plaintiffs claim that in 4Q04 Hutchinson should have booked an increase in the return allowance of $1.6 million, rather than the $1.3 million actually booked. Compl. ¶ 53(g). It is not immediately apparent to the Court that, during a quarter in which Hutchinson reported net sales of over $122 million, Compl. ¶ 51, a difference of $300,000 in the return-allowance increase would be material.

In any event, regardless of whether a $300,000 difference is material, plaintiffs have, as noted, failed to offer factual allegations supporting that amount. In other words, plaintiffs have failed to adequately allege why the understatement was $300,000, as opposed to, say, $200,000 or $400,000. Because plaintiffs have not adequately alleged what the return allowances should have been, plaintiffs have by defini-

tion not adequately alleged that the reported return allowances were *materially* false or misleading. *Cf. Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir.2003) (simply restating earnings does not by itself render the original misstatement material regardless of the magnitude of the discrepancy); *In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir.2004) (per curiam) (misrepresentations may be immaterial as a matter of law if they conceal insignificant data that would not be relevant to the total mix of information).

2. Other Allegedly False Statements

The second group of false or misleading statements on which plaintiffs base their claims are Fortun's and Ingleman's public statements in company press releases and conference calls. The complaint includes long quotations from these press releases and conference calls; some of those quotations are highlighted and italicized. It is apparent that plaintiffs do not claim that all of these statements—even all of the highlighted and italicized statements—are false.[6] For example, plaintiffs identify many statements in which Fortun or Ingleman refer to the growth in demand for suspension assemblies. Nothing in the complaint explains how or why these statements are false. To the contrary, plaintiffs rely on the truth of those statements to support their allegations of fraud.[7]

---

6. Insofar as plaintiffs allege that Fortun's and Ingleman's statements reiterating the company's reported financial results are false, those allegations are deficient for the same reasons that plaintiffs' allegations of false financial statements are deficient.

7. In August 2005, Hutchinson announced that it was revising its 4Q05 guidance because of weakness in demand earlier in the quarter. Citing this announcement, plaintiffs allege that "Fortun *finally admitted* the Company was experiencing lower demand." Compl. ¶ 81 (emphasis added). This allegation is totally at odds with the remainder of the complaint, which alleges that Hutchinson's whole

problem was its inability to *keep up* with demand.

Plaintiffs explain this contradiction by suggesting that Hutchinson's failure to satisfy its customers early in the class period ultimately caused Hutchinson to lose them late in the class period. But plaintiffs have not alleged any facts that would support their theory that Hutchinson received fewer orders late in the class period because of problems meeting demand earlier in the class period—as opposed to, say, a weaker economy or problems at a couple of Hutchinson's major customers. Moreover, plaintiffs' theory fails for lack of any false statement or adequate allegations of scienter (see below), and it is also not consis-

Similarly, plaintiffs quote a number of statements about Hutchinson's plans to expand its production capacity, none of which are alleged to be false.

 When asked at oral argument to identify the core false statements (other than the allegedly false financial statements discussed above)—that is, to identify the biggest lies told by any of the individual defendants—plaintiffs pointed to Fortun's April 21, 2005 statement that "[w]e believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months." Compl. ¶ 67. This statement is misleading, plaintiffs allege, because Fortun knew that Hutchinson was operating at peak capacity and experiencing related production problems, especially in the production of its newer suspension assemblies.

But, as plaintiffs themselves concede, Hutchinson in no way *hid* the fact that it was operating at full capacity. Fortun candidly admitted during the same April 21 conference call that "[w]e have been on a forced march since about mid-November last year. We have not been able to hold inventories to where they need to be.... We're going to have to really scramble to stay with it." Compl. ¶ 67. No objective observer could miss Fortun's point: Hutchinson was having trouble keeping up with demand. Similarly, Fortun had stated just three months earlier that "[a]t current levels of demand we are operating at close to full capacity.... [R]ight now [we are] struggling to figure out how we're going to meet the general demand requirements and build some inventory at the same time. As John [Ingleman] said earlier, we don't know if we're going to necessarily make that happen." Compl. ¶ 58. Because Fortun was clear and specific in

disclosing that Hutchinson was operating at peak capacity, "really scrambl[ing]" to try to maintain proper inventory levels, and "struggling" to meet demand, plaintiffs cannot claim that Fortun's general statement that Hutchinson was "well-positioned" misled investors. Plaintiffs complain that they wrongly concluded that Hutchinson's defect rate was not increasing, but plaintiffs do not cite anything that defendants said to lead them to that conclusion (other than the allegedly misleading return allowances discussed previously).

The Court also agrees with defendants that Fortun's statement is not material. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997) (" 'soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth' ") (quoting *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 211 (4th Cir.1994)). At oral argument, plaintiffs conceded that the statement "we are well-positioned for the future" would be too vague to be actionable. Plaintiffs contend that Fortun's statement is nevertheless specific enough to be actionable because it refers to a certain product. That is not exactly true; Fortun refers to being well-positioned on "a number of new disk drive programs." Even if it were true, that circumstance would not be enough to take Fortun's statement out of the realm of puffery. What is important about Fortun's statement is not to which product or products he was referring; what is important is what Fortun *said* about that product or products. And what Fortun said was merely that Hutchinson was "well-positioned" for the coming months. This is simply too vague to be considered mate-

tent with plaintiffs' innuendo in ¶ 81 that Fortun was concealing a long-term lack of de-

mand.

rial. *See Parnes,* 122 F.3d at 547 (finding statement that company expected "significant growth" in the future too vague to be material).

■ Plaintiffs also complain of Hutchinson's projections of future sales and earnings. But for most of the class period, Hutchinson's actual financial results were within or above its guidance. Compl. ¶¶ 45, 47, 55, 65. Hutchinson had admitted in January 2005 that it was operating at peak capacity and was having difficulty meeting demand. The fact that Hutchinson nevertheless managed to meet or exceed its guidance for most of the class period indicates that Hutchinson took those issues into account, and plaintiffs allege no additional facts that would render Hutchinson's guidance for the later quarters (3Q05 and 4Q05) false or misleading at the time the guidance was given. "Simply alleging that defendants made a particular statement at a given time ... and then showing in hindsight that the statement is false misses the [Reform Act's] pleading requirement." *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 743 (8th Cir.2002). Plaintiffs have failed to allege with the specificity required by the Reform Act that defendants made any materially false or misleading statements.

## C. Scienter

■ Scienter means the intent to deceive, manipulate, or defraud. *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP,* 395 F.3d 851, 854 (8th Cir.2005). Negligence—even gross or inexcusable negligence—is not sufficient to meet this standard. *Id.* Severe recklessness is sufficient, but it can be found only in connection with

> "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers

which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Id.* (quoting *Green Tree,* 270 F.3d at 654).

■ As noted above, the Reform Act requires that plaintiffs must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). There are at least a couple of ways for plaintiffs to accomplish this. Plaintiffs may allege that the defendants knew or had access to information suggesting that their statements were materially inaccurate. *Navarre,* 299 F.3d at 746. Plaintiffs may also rely on allegations that the defendants had the motive and opportunity to perpetrate a fraud. But motive-and-opportunity allegations must go beyond alleging a general desire to increase stock prices and officer compensation, because that desire is universal among corporate insiders. *Kushner,* 317 F.3d at 830; *K–tel,* 300 F.3d at 895; *Green Tree,* 270 F.3d at 655–56. Instead, the allegations must show that the particular defendant benefitted in some concrete and personal way from the alleged fraud, such as through insider trading. *Kushner,* 317 F.3d at 827; *Green Tree,* 270 F.3d at 656. Even allegations of insider trading are insufficient to show scienter unless the trades are unusual in light of prior trading history, the amount of profit made, the amount of stock traded, the portion of stock sold, or the number of insiders involved. *Green Tree,* 270 F.3d at 659; *In re Cerner Corp. Sec. Litig.,* 425 F.3d 1079, 1085 (8th Cir.2005).

In this case, plaintiffs allege both that defendants had access to information suggesting that their public statements were inaccurate, and that defendants engaged in unusual insider trading during the class period. Plaintiffs also allege that defendants' performance-based compensation

packages add to the inference of scienter raised by the other allegations in the complaint.

### 1. Information Contradicting Defendants' Public Statements

■ As discussed above, plaintiffs allege that defendants' false statements primarily consist of (1) Hutchinson's reported financial results for 4Q04, 1Q05, and 2Q05; and (2) Fortun's April 21, 2005 statement that "[w]e believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months." Compl. ¶ 67. Plaintiffs allege that, in contrast to these public statements, defendants were aware of dramatic increases in customer-return and product-defect rates. But even assuming that plaintiffs have adequately alleged that the customer-return and product-defect rates were skyrocketing, these allegations do not contradict defendants' public class-period statements.

A comparison to *Green Tree* is illuminating. In *Green Tree*, the corporate defendant, a mortgage company, factored a low loan-prepayment rate into its recorded earnings. *Green Tree*, 270 F.3d at 649. The plaintiffs alleged that, at the time the defendants reported their earnings, the defendants knew that the actual prepayment rate was much higher. *Id.* at 662. The Eighth Circuit held that these allegations added weight to other circumstantial allegations of scienter. *Id.*

In this case, unlike *Green Tree*, there is no allegation that defendants based Hutchinson's return allowance on unrealistic assumptions, or that defendants knew that any such assumptions were at odds with reality. As described at length above, plaintiffs have not adequately alleged how Hutchinson in fact calculated the return allowances, why the return allowances were inadequate, or on what plaintiffs base their assertion that the return allowances

should have been increased by an additional 22.5%, 168.5%, and 191% in the three quarters at issue. While plaintiffs point again and again to CW2's claim that Hutchinson's product-defect rate rose from 8% to 15% during the class period, plaintiffs simply fail to allege any contrary assumptions that were built into defendants' reported financial results.

As for Fortun's April 21 statement, plaintiffs fail to allege any facts demonstrating that Fortun knew, when he made the statement, that Hutchinson was *not* "well-positioned on a number of new disk drive programs." As discussed above, Hutchinson met or exceeded its financial projections for most of the class period, even while admitting to the market that it was operating at close to full capacity and might have difficulty meeting demand. Hutchinson had also recently announced plans to increase its production capacity through an additional $100 million in capital spending. Plaintiffs point to no undisclosed facts even remotely suggesting that Fortun or any of the other defendants had reason to believe that Hutchinson was failing to address the defect-rate problems, or that the defect rates were not simply part of the normal ups and downs of the business cycle. Plaintiffs' allegations do not give rise to even a reasonable inference of scienter, much less to the strong inference required by the Reform Act.

### 2. Unusual Insider Trading

■ Plaintiffs also allege that the individual defendants' stock sales during the class period give rise to a strong inference of scienter. Plaintiffs argue that the individual defendants sold large amounts of stock during the class period, whereas in the two years prior to the class period most of the defendants sold relatively little stock. An examination of the timing of the class-period sales, however, demonstrates

that these sales are insufficient to raise a strong inference of scienter.

In the first class-period stock sale, Fortun, Ingleman, Graczyk, Schaefer, and Penn sold a combined total of 137,750 shares for net proceeds of almost $6 million. These sales took place from November 3, 2004 through November 5, 2004, shortly after Hutchinson announced its 4Q04 financial results. Plaintiffs' stock-price chart (Compl.Ex.A) shows that the price of Hutchinson's stock actually *fell* after that announcement, and that these sales took place largely during and after the decline. Fortun and Ingleman sold stock only one other time during the class period: in late July 2005, several days after Hutchinson announced that it would not meet its 3Q05 shipment projections. Compl. ¶¶ 77, 80, 98, & Ex. A. The price of Hutchinson stock fell sharply after that announcement, and again, Fortun's and Ingleman's sales took place largely *after* the decline, when the stock price was well below the class-period high it had reached less than two months earlier. (Green, the chairman of the board, also sold stock at this time, in what was his only class-period stock sale.)

Fortun is the president and CEO of Hutchinson, and Ingleman is the vice president and CFO. Together with Green (the chair of the board), these defendants represent the most powerful of the individual defendants and the ones most likely to be in a position to capitalize on inside information. Plaintiffs' complaint largely focuses on Fortun and Ingleman; in contrast, the complaint contains very little in the way of information about the other defendants, other than their stock sales and positions in the company. Yet the only times Fortun and Ingleman—plaintiffs' two star attractions—sold stock during the class period was *after* Hutchinson disclosed information to the market that caused the stock price to *drop*. Similarly, Green sold stock only once, when it was in a decline *after* unfavorable news. Significantly, these three insiders—like all the individual defendants—sold no stock when the price was at or near its class-period high. The timing of these sales is simply not consistent with plaintiffs' claim that these three defendants were withholding information from the market. *See K–tel*, 300 F.3d at 896 (selling after delivering news that causes a company's stock price to go down is not suggestive of withholding information).[8]

Plaintiffs try to salvage their insider-trading allegations by pointing out that, a month after Fortun, Ingleman, and Green sold their stock in July 2005 (for the last— and, in Green's case, the only—time during the class period), Hutchinson announced that demand was down and that the company was lowering its 4Q05 financial projections dramatically. Plaintiffs claim that this timing is suspicious, and that Fortun, Ingleman, and Green must have known that this bad news was coming. Putting aside the problem that plaintiffs allege no facts indicating that Fortun, Ingleman, and Green knew of the weakening demand in July—and putting aside that this is only one set of sales by only some of the individual defendants—there is an additional problem: If these three defendants knew, at the time that they sold their stock, that bad news was coming, presumably it would have been in their interests to put off the disclosure of that bad news as long as possible, because the closer the release of the bad news followed on the heels their stock sales, the more suspicious those sales would have appeared. And yet defendants

---

8. The timing of Penn's sale also lacks any indicia of fraud, as he sold stock only once during the class period, when the stock was at or near the class-period low. Compl. ¶ 98 & Ex. A.

disclosed the negative information in August, well before the end of the fourth quarter. Almost surely, defendants could have found a way to delay releasing that information, perhaps even until the release of Hutchinson's 4Q05 results several months later. Instead, they went to the market with the information. There is simply nothing suspicious about the stock sales of Fortun, Ingleman, and Green, the three key company insiders.

The only other stock sales that took place during the class period were Graczyk's and Schaefer's sales in January 2005 and Graczyk's final sale in April 2005. Compl. ¶ 98. Like Fortun, Ingleman, and Penn, however, Graczyk and Schaefer sold stock before it reached its class-period high and sold none while it was at or near its high, a fact which undercuts any inference of scienter. Moreover, even if some weak inference of scienter could be gleaned from Graczyk's or Schaefer's stock sales, that inference would be untenable in light of the lack of allegations that those defendants were in any way responsible for Hutchinson's financial reports or other allegedly false class-period statements.

Plaintiffs contend that Graczyk and Schaefer are responsible for those statements under the "group-pleading" doctrine, which permits plaintiffs to attribute collective statements (such as press releases or SEC filings) to individuals with direct involvement in the everyday business of the company. See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir.2004). This doctrine was not widely adopted prior to the Reform Act, Southland, 365 F.3d at 363 (noting that the Ninth and Second Circuits have largely pioneered the doctrine), and, subsequent to the enactment of the Reform Act, courts have split over whether the group-pleading doctrine is still viable. Compare Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602–03 (7th Cir.2006) (holding that the group-pleading doctrine is inconsistent with the Reform Act's particularity requirements), cert. granted, —— U.S. ——, 127 S.Ct. 853, 166 L.Ed.2d 681 (Jan. 5, 2007); Southland, 365 F.3d at 364–65 (same); and In re Patterson Cos. Sec., Derivative & ERISA Litig., 479 F.Supp.2d 1014, 1028–29 (D.Minn. 2007) (same), with In re Retek Inc. Sec. Litig., No. 02–4209, 2007 WL 14352, at *6 (D.Minn. Jan.3, 2007) (applying the group-pleading doctrine in denying a motion to dismiss), and In re Stellent, Inc. Sec. Litig., 326 F.Supp.2d 970, 983 (D.Minn.2004) (same).

This Court agrees with those courts that hold that the group-pleading doctrine is inconsistent with the requirements of the Reform Act. As those courts have observed, the Reform Act's requirement that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" cannot be reconciled with a presumption that would permit plaintiffs to impute a state of mind to a defendant based simply on his or her status in the company. Cf. Kushner, 317 F.3d at 827 (holding that the plaintiffs' complaint was deficient because it "makes no particular assertion of which defendant was responsible for which statement or omission, or how any defendant participated in the alleged scheme"). In addition, even if the Court were to find that the group-pleading doctrine was valid, it would not apply to Graczyk and Schaefer, whose job titles (vice president of business development and chief technical officer, respectively) do not on their face indicate that they bear any responsibility for contributing to or preparing corporate financial statements. Cf. City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 690 (6th Cir.2005) (holding that the plaintiff's complaint, which pleaded little more than the defendant's corporate titles, dates of employment, and attend-

ance at quarterly meetings, was insufficient even under the group-pleading doctrine).

### 3. Compensation Packages

█ Finally, plaintiffs allege that all of the individual defendants (save Green) received bonuses that were tied to Hutchinson's reported financial results. As a general matter, "[p]leading the simple fact 'that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings.'" *Kushner*, 317 F.3d at 830 (quoting *Green Tree*, 270 F.3d at 661). Citing *Green Tree*, plaintiffs argue that these particular defendants received unusually large bonuses, and that this fact makes the bonuses significant to scienter in this case. But in *Green Tree* the size of the bonus at issue was not the only distinguishing factor. The Eighth Circuit relied heavily on the fact that the overstatements of the company's financial performance were perfectly timed to maximize the CEO's compensation under an extremely lucrative contract that was about to expire. *Green Tree*, 270 F.3d at 661. The plaintiffs in this case, unlike the plaintiffs in *Green Tree*, allege nothing particularly unusual about the circumstances under which the individual defendants collected their bonuses. Even if the size of their bonuses, standing alone, could be considered significant, that factor does not add appreciably to the allegations of scienter in the remainder of the complaint.

█ Considering the complaint as a whole, plaintiffs have failed to meet the Reform Act's scienter-pleading requirement with respect to any of the individual defendants. This failure is also fatal to plaintiffs' claim against Hutchinson. *Cf.*

*Southland*, 365 F.3d at 367 (holding that at least one corporate agent must possess the requisite scienter in order for a court to impute scienter to the corporation); *Makor*, 437 F.3d at 603 (when facts alleged give rise to a strong inference of scienter with respect to a corporate agent, the court imputes that scienter to the corporate principal).

### D. Section 20 Claim

█ Plaintiffs also allege that the individual defendants are liable as controlling persons under Section 20 of the 1934 Act, 15 U.S.C. § 78t. As noted above, a § 78t claim is derivative of other claims under the 1934 Act, and without a separate underlying violation of the Act, a § 78t claim necessarily fails. *Deviries*, 805 F.2d at 329. Plaintiffs have failed to state a claim under § 78j(b), and thus their § 78t claim must be dismissed.

### E. Leave to Amend

█ Plaintiffs ask for leave to amend their complaint in the event that the Court finds their allegations deficient. Although plaintiffs' brief does not specify what, if any, amendments they could make that would cure the many deficiencies in their complaint, at oral argument and afterwards plaintiffs submitted additional materials that purportedly demonstrate that Hutchinson's return allowances turned out to be inadequate—that is, that customer returns ended up exceeding the earlier estimates. Specifically, plaintiffs offer Hutchinson's 2Q06 and 3Q06 Form 10–Qs (reporting increases in Hutchinson's "allowance related to warranties issued" for those quarters) and Hutchinson's November 2, 2006 Form 8–K (reporting an adjustment to certain revenues recorded in 2004 and 2005).[9] Plaintiffs also offer

---

**9.** A Form 8–K "current report" must be filed in connection with certain triggering events, such as the disclosure of material non-public information regarding a completed fiscal year or quarter. *See* General Instructions, Form

Hutchinson's FY06 Form 10–K and 2Q07 Form 10–Q, which disclose that the SEC has opened an investigation and requested information with respect to some of the allegations in this lawsuit.

Hutchinson's 2Q06 and 3Q06 Form 10–Qs relate to fiscal periods outside of the class period. When asked at oral argument whether the increases in the allowances represented a correction for products sold during the class period, plaintiffs conceded that they did not know, but that they suspected as much. The Reform Act requires more than suspicions, however; it requires facts giving rise to a strong inference of scienter. Even if the 2Q06 and 3Q06 allowances were a correction for class-period understatements, that fact alone would not be enough to show that the class-period understatements were knowingly or recklessly false. As noted above, the fact that an estimate turns out to be wrong does not mean that the estimate was fraudulent. In any event, plaintiffs have offered nothing other than speculation that the 2Q06 and 3Q06 numbers have anything to do with the class period.

In its Form 8–K filed on November 2, 2006, Hutchinson disclosed, among other things, that it was electing early application of the SEC's new Staff Accounting Bulletin No. 108 ("SAB No. 108"), "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements." In general, SAB No. 108 governs how a corporation should treat errors from previous fiscal periods that individually were not large, but that in the aggregate may have a material effect on the current fiscal period. Hutchinson's November 2, 2006 Form 8–K reports adjustments for the first three quarters of FY06 and states that "[t]his adjustment was related to certain revenues that were recorded in 2004 and 2005, but that should have been deferred." Notice

8–K, at 2, 7, *available at* http://www.sec.gov/

of Recent Developments Ex. A at 18 [Docket No. 55]. Plaintiffs point out that the class period spans parts of 2004 and 2005. Without any further information about these incorrectly recorded revenues, however, there is no basis for concluding that the relatively small adjustments reported in the 8–K have anything to do with fraud, much less with plaintiffs' particular allegations. Those allegations relate not to Hutchinson's revenue-recognition practices, but to its calculation of its return allowance.

Finally, the fact that the SEC has opened an investigation and requested information about this litigation from Hutchinson is completely irrelevant to the sufficiency of plaintiffs' complaint. For example, it does not suggest that any of the alleged false statements were actually false, it does not add to any inference of scienter, and it does not render Fortun's statement that Hutchinson was "well-positioned" material.

For these reasons, the Court concludes that granting plaintiffs leave to amend their complaint to include these allegations would be futile. Leave to amend is therefore denied. *See Cerner,* 425 F.3d at 1086 (futility is a valid reason to deny leave to amend a complaint).

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [Docket No. 36] is GRANTED.

2. Plaintiffs' consolidated complaint [Docket No. 34] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

about/ forms /form8–k.pdf.

LET JUDGMENT BE ENTERED AC-
CORDINGLY.